PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 09-2230 & 09-2231
_____

In re:  FEDERAL-MOGUL GLOBAL INC., et al,

Reorganized Debtors

Hartford Accident and Indemnity Company;
First State Insurance Company;
New England Insurance Company;
*Allianz Global Corporate & Specialty AG,
(as successor-by-patial-merger to Allianz Vericherungs AG
as to Policy No. H O 001 456);
*Allianz Global Risks U.S. Insurance Company,
(f/k/a Allianz Insurance Company);
*Allianz Underwriters Insurance Company,
(f/k/a Allianz Underwriters, Inc.);
Columbia Casualty Company;
Continental Casualty Company;
The Continental Insurance Company,
(both in its individual capacity and as successor to
certain interests of Harbor Insurance Company);
Fireman's Fund Insurance Company;
National Surety Company;
Certain Underwriters at Lloyd's London;

Certain London Market Companies,

Appellants

(*Dismissed pursuant to Court Order dated 12/28/10)
_____

On Appeal from the United States District Court
for the District of Delaware
D.C. Civil Action Nos. 08-cv-00229 & 08-cv-00230
(Honorable Joseph H. Rodriguez)
_____

Argued November 9, 2011
Before:  SCIRICA, SMITH and JORDAN, *Circuit Judges*.

(Filed: May 1, 2012)

DANIELLE M. SPINELLI, ESQUIRE (ARGUED)
CRAIG GOLDBLATT, ESQUIRE
Wilmer Cutler Pickering Hale & Dorr
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
        Attorneys for Appellants,
        Hartford Accident and Indemnity Company;
        First State Insurance Company;
        New England Insurance Company

DAVID C. CHRISTIAN II, ESQUIRE
Seyfarth Shaw
131 South Dearborn Street, Suite 2400

Chicago, Illinois 60603
        Attorney for Appellants,
        Columbia Casualty Company;
        Continental Casualty Company;
        The Continental Insurance Company

JOHN D. DEMMY, ESQUIRE
Stevens & Lee
1105 North Market Street, Suite 700
Wilmington, Delaware 19801
        Attorney for Appellants,
        Fireman's Fund Insurance Company;
        National Surety Company

EILEEN T. McCABE, ESQUIRE
Mendes & Mount
750 Seventh Avenue
New York, New York 10019

MICHAEL A. SHINER, ESQUIRE
Tucker Arensberg
1500 One PPG Place
Pittsburgh, Pennsylvania 15222

RUSSELL W. ROTEN, ESQUIRE (ARGUED)
Duane Morris
865 South Figueroa Street, Suite 3100
Los Angeles, California 90017

RICHARD W. RILEY, ESQUIRE

Duane Morris
222 Delaware Avenue, Suite 1600
Wilmington, Delaware 19801
    Attorneys for Appellants,
    Certain Underwriters at Lloyd's London;
    Certain London Market Companies

WILLIAM A. EVANOFF, ESQUIRE
JEFFREY C. STEEN, ESQUIRE
Sidley Austin
One South Dearborn Street
Chicago, Illinois 60603

LAURA D. JONES, ESQUIRE
JAMES E. O'NEILL, III, ESQUIRE
Pachulski Stang Ziehl & Jones
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
    Attorneys for Appellees,
    Federal-Mogul Global, Inc., et al.

KATHLEEN C. DAVIS, ESQUIRE
Campbell & Levine
800 North King Street, Suite 300
Wilmington, Delaware 19801

PETER VAN N. LOCKWOOD, ESQUIRE (ARGUED)
Caplin & Drysdale
One Thomas Circle, N.W., Suite 1100

Washington, D.C. 20005
     Attorneys for Appellee,
     Official Committee of Asbestos Claimants

EDWIN J. HARRON, ESQUIRE
SHARON M. ZIEG, ESQUIRE
Young Conaway Stargatt & Taylor
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
     Attorneys for Appellee,
     Eric D. Green, Legal Representative for
     Future Asbestos Claimants of
       Federal-Mogul Global Inc., et al.

————————————

OPINION OF THE COURT

————————————

SCIRICA, *Circuit Judge*.

Federal-Mogul Global and its affiliates filed for Chapter 11 bankruptcy and sought to resolve asbestos-related liability through the creation of a personal-injury trust under 11 U.S.C. § 524(g).[1] As part of its reorganization plan, it

---

[1] Besides the Reorganized-Debtors Federal-Mogul, there are two additional Appellees: the Official Committee of Asbestos Claimants and the Legal Representative for Future Asbestos

sought to transfer rights under insurance liability policies to the trust. Appellants Insurers[2] had provided liability policies to the debtors prior to bankruptcy and objected that the transfer violated the policies' anti-assignment provisions. Federal-Mogul contended that 11 U.S.C. § 1123(a)(5)(B) preempts those provisions, and the bankruptcy and district courts agreed. We will affirm.

## I.

### A.

Claimants. For the sake of brevity, we will refer to the Appellees collectively as "Federal-Mogul."

[2] Appellants are five groups of insurers: (1) Hartford Accident and Indemnity Company, First State Insurance Company, and New England Insurance Company; (2) Allianz Global Corporate & Specialty AG, Allianz Global Risks U.S. Insurance Company (formerly known as Allianz Insurance Company), and Allianz Underwriters Insurance Company (formerly known as Allianz Underwriters, Inc.); (3) Columbia Casualty Company, Continental Casualty Company, and the Continental Insurance Company (both in its individual capacity and as successor to certain interests of Harbor Insurance Company); (4) Fireman's Fund Insurance Company and National Surety Company; and (5) Certain Underwriters at Lloyd's, London and Certain London Market Companies. Briefs were filed on behalf of the first four groups under the caption "Certain Appellants," and on behalf of the fifth under the caption "London Market Insurers" ("LMI"). We refer to Appellants collectively as "Insurers."

For almost two decades, Chapter 11 bankruptcies have employed a statutory mechanism created by 11 U.S.C. § 524(g) to resolve massive asbestos liability and to evaluate claims and allocate payments to current and future asbestos claimants. When this provision's requirements are satisfied, the bankruptcy court may issue an injunction channeling all current and future claims based on the debtor's asbestos liability to a personal injury trust. This case centers on these trusts.

The salience of § 524(g) trusts stems from the ongoing dilemma of asbestos liability, "the longest-running mass tort litigation in the United States." Stephen J. Carroll et al., RAND Inst. for Civil Justice, *Asbestos Litigation* 21-24 (2005).[3] As courts and commentators have noted, a just and efficient resolution of asbestos claims has often eluded the

---

[3] By the end of 2002, over 730,000 claimants had sought relief from over 8,400 defendants. Carroll, *supra*, at 70-79. More recent data demonstrates that asbestos filings peaked in 2003 and have fallen significantly since then, with the annual number of filings at around 20% of 2001 levels. Mary Elizabeth C. Stern et al., NERA Econ. Consulting, *Snapshot of Recent Trends in Asbestos Litigation: 2011 Update* fig. 1 (2011), *available at* http://www.nera.com/nera-files/PUB_Recent_Trends_Asbestos_Litigation_0711.pdf. The number of pending claims has also fallen below 2001 levels after peaking mid-decade, while the value of each resolved claim rose, likely due to a larger proportion of malignant over non-malignant claims. *Id*. at 4-7.

traditional tort system.[4]   *See In re Congoleum Corp.*, 426 F.3d 675, 693 (3d Cir. 2005); *In re Combustion Eng'g, Inc.*,

[4] Asbestos liability has also fit poorly into the usual dynamics of insurance coverage.  While the dangers of asbestos were becoming known when insurers drafted comprehensive general liability policies in the 1950s and 1960s, they likely did not foresee the rise of enormous mass tort liability decades later.  *See* Kenneth S. Abraham, *The Maze of Mega-Coverage Litigation*, 97 Colum. L. Rev. 2102, 2105 (1997).  Written on an injury- or occurrence-basis, the policies were ill-fitted to address long-latency diseases based on prolonged exposure.  *Id.*  Courts interpreted the policies' coverage language to impose a "continuous trigger" of insurance coverage for asbestos liability, holding that every policy on the risk between first exposure to manifestation—often a period of decades—was triggered.  *See Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1042-47 (D.C. Cir. 1981); James M. Fischer, *Insurance Coverage for Mass Exposure Tort Claims: The Debate over the Appropriate Trigger Rule*, 45 Drake L. Rev. 625, 646-50 (1997) (summarizing the development and justifications for the continuous trigger of coverage).

   The result of the continuous trigger rule has been the apportionment of liability among numerous insurers, often posing difficult questions of allocation and likely incentivizing policyholders to file suit against all insurers who sold them coverage during the trigger period.  Abraham, *supra*, at 2106-07.  Further complicating the situation is the distorting effect of multiple insurance layers on insurers'

391 F.3d 190, 200 (3d Cir. 2004); *see also* Richard A. Nagareda, *Mass Torts in a World of Settlement* x-xiii (2007). The aggregate pressure of such claims has led to a variety of quasi-administrative approaches to asbestos liability,[5] but

incentives. Primary insurers had the duty to defend against claims that exceeded their policy limits, so they allegedly minimized defense costs by rushing into aggregate settlements that included claims of dubious value while passing the settlements' cost onto excess insurers. Richard A. Nagareda, *Mass Torts in a World of Settlement* 27-28 (2007); Michelle J. White, *Why the Asbestos Genie Won't Stay in the Bankruptcy Bottle*, 70 U. Cin. L. Rev. 1319, 1334-36 (2002).

[5] Both courts and corporations have attempted to implement innovative solutions to remedy the perceived deficiencies of the tort system to address the flood of asbestos claims, but these have proved unsuccessful because of the limitations on the powers of courts and of private parties. In the Eastern District of Texas, Judge Robert Parker sought to implement a three-part trial procedure for addressing three thousand asbestos claims by using statistical sampling and test trials to create a compensation grid that would be extrapolated to all pending claims. *Cimino v. Raymark Indus., Inc.*, 751 F. Supp. 649 (E.D. Tex. 1990). This plan was overturned on appeal for violating the defendants' Seventh Amendment rights. *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998). Owens Corning, a major asbestos manufacturer, sought to create a "National Settlement Program" outside the judicial system by entering private contracts with plaintiffs' firms that would have settled the claims of the firms' clients

9

Congress has yet to create the "national asbestos dispute-resolution scheme" requested by the Supreme Court, *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 598 (1997) (citing Judicial Conference of the U.S., *Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation* 3, 27-35 (1991)); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 & n.1 (1999).[6] Initial attempts to employ the class action device to resolve the claims of present and future asbestos victims failed to adequately protect the interests of absent class members. *Amchem*, 521 U.S. at 625-28; *Ortiz*, 527 U.S. at 848-59.

A consequence of the failure to create a comprehensive resolution to asbestos litigation has been a reliance on the Bankruptcy Code to provide some

---

based on an administrative grid. Nagareda, *supra*, 108-13. But Owens Corning could not create a universal binding system through private contract, and so the innovation failed. *Id*. The company filed for bankruptcy, creating a § 524(g) trust to address its asbestos liability. *Id*.

[6] Various alternatives have been proposed in Congress, including several proposals along the lines of the administrative scheme adopted for black lung compensation, but they have not been enacted. *See* U.S. Gov't Accountability Office, GAO-11-819, *Asbestos Injury Compensation: The Role and Administration of Asbestos Trusts* app'x I (2011), *available at* http://www.gao.gov/new.items/d11819.pdf (summarizing congressional proposals to address asbestos litigation since 1973).

predictability and regularity in addressing mass tort liability. Bankruptcy has proven an attractive alternative to the tort system for corporations because it permits a global resolution and discharge of current and future liability, while claimants' interests are protected by the bankruptcy court's power to use future earnings to compensate similarly situated tort claimants equitably.  S. Elizabeth Gibson, Fed. Judicial Ctr., *Judicial Management of Mass Tort Bankruptcy Cases* 1-2 (2005).  The primary bankruptcy innovation for addressing mass tort liability has been the post-confirmation trust, which first appeared in the bankruptcy proceedings of the Johns-Manville Corporation, the largest producer of asbestos-containing products.  Lloyd Dixon et al., RAND Inst. for Civil Justice, *Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts* 5 (2010) [hereinafter *RAND Trust Report*].  In that case, the bankruptcy court issued a channeling injunction under 11 U.S.C. § 105 requiring future asbestos claims be brought against a trust created to compensate victims, and barring actions against the reorganized debtor, its subsidiaries, or any settling insurance company.[7]  *In re Johns-Manville Corp.*, 68 B.R. 618, 624-28 (Bankr. S.D.N.Y. 1986),

---

[7] Initially, the Johns-Manville trust paid claimants the full value of their claims. *RAND Trust Report*, *supra*, at 5-6.  The number of claims quickly exceeded projections, and in 1995 the trust was reorganized to pay less than the full value of claims, to give priority to seriously-ill claimants, and to create an administrative role for a representative to protect future claimants' interests. *Id*.

*aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636 (2d Cir. 1988).

Congress codified the Johns-Manville trust mechanism as a "creative solution to help protect . . . future asbestos claimants," H.R. Rep. No. 103-835, at 47 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3348, in the Bankruptcy Reform Act of 1994, Pub. L. 103-394, § 111, 108 Stat. 4106, 4113-17 (codified at 11 U.S.C. § 524(g)-(h)). Congress intended the trusts as a means to give "full consideration" to the interests of future claimants by ensuring their claims would be compensated comparably to present claims, while simultaneously enabling corporations saddled with asbestos liability to obtain the "fresh start" promised by bankruptcy.[8] H.R. Rep. No. 103-835, at 46-48. To achieve these goals and "protect the due process rights of future claimants," section 524(g) imposed "many statutory prerequisites" that must be

---

[8] As one senator described it, § 524(g) "affirm[s] what Chapter 11 reorganization is supposed to be about: allowing an otherwise viable business to quantify, consolidate, and manage its debt so that it can satisfy its creditors to the maximum extent feasible, but without threatening its continued existence and the thousands of jobs that it provides." 140 Cong. Rec. 28,358 (1994) (statement of Sen. Brown).

satisfied before a channeling injunction may issue.[9] *Combustion Eng'g*, 391 F.3d at 234 n.45.

As of May 2011, there were fifty-six asbestos personal-injury trusts, with several more in process. Lloyd Dixon & Geoffrey McGovern, RAND Inst. for Civil Justice, *Asbestos Bankruptcy Trusts and Tort Compensation* 1 n.1 (2011). Through 2010, the trusts have paid about 3.3 million claims valued at roughly $17.5 billion. U.S. Gov't Accountability Office, *supra*, at 16. There is substantial similarity among the various trusts in structure and function. Nearly all the trusts are governed by trustees who manage financial affairs, while a committee of advocates, consisting of representatives of current and future claimants, must approve substantial trust activities.[10] *RAND Trust Report*,

---

[9] Under the law, the bankruptcy court may grant a channeling injunction only if (1) the debtor is subject to substantial and uncertain future asbestos liability, (2) the trust owns a majority of the voting shares of the debtor or corporate parent, (3) seventy-five percent of current claimants vote to approve the plan, and (4) the trust operates through mechanisms that assure the plan will pay "present claims and future demands . . . in substantially the same manner." 11 U.S.C. § 524(g)(2)(B). The injunction may bind future claimants only if a future claims representative is appointed during the reorganization and the bankruptcy court determines the injunction is "fair and equitable" with respect to future claimants. *Id.* § 524(g)(4)(B).

[10] Although there are usually more representatives of current than future claimants, they possess equal authority and must

*supra*, at 11-14. Moreover, like the Johns-Manville trust on which they are modeled,[11] asbestos personal-injury trusts receive funding from three primary sources: debtor cash, debtor stock, and insurance settlements. *See id.* at app. B (categorizing the initial funding of the 26 largest asbestos trusts as "Cash from debtor(s)," "Stock from debtors(s) [sic]," "Insurance settlements," or "Other assets"). While some trusts have been funded primarily with an initial infusion of cash from the debtor, *id.* at 65, 105, 137, and others have consisted primarily of funds obtained from insurance, *id.* at 55, 79, 115, 123, most rely on a mix of assets. Finally, all trusts have Trust Distribution Protocols (TDPs) to govern

---

both consent to substantial modifications of the trust. *RAND Trust Report*, *supra*, at 13-14.

[11] When drafting § 524(g), Congress observed that the Johns-Manville trust was funded "through stock of the emerging debtor company and a portion of future profits, along with contributions from Johns-Manville's insurers." H.R. Rep. No. 103-835, at 47. The insurers' contributions to the Johns-Manville trust consisted of a negotiated settlement with Johns-Manville following protracted litigation. The insurers ultimately agreed to pay $770 million in return for injunctive protection against all future claims. *MacArthur Co. v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 837 F.2d 89, 90 (2d Cir. 1988). This funding constituted "most of the initial corpus of the Trust," and was considered the "cornerstone of the Manville reorganization." *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, ----, 129 S. Ct. 2195, 2199 (2009) (internal quotation marks omitted).

how claims are processed and compensated.[12] These procedures are approved as part of the bankruptcy reorganization plan but may later be modified. *Id.* at 14.

---

[12] TDP procedures are similar across most trusts, including the Federal-Mogul trust. Claimants generally select between expedited or individual review. *RAND Trust Report, supra*, at 15. Under expedited review, a claimant presents evidence to satisfy pre-established medical and exposure criteria. *Id*. at 17-19. Once met, the claim is liquidated according to a compensation grid based on eight disease levels that provide the highest payment to those suffering from mesothelioma and other malignant diseases. *Id*. If a claimant seeks individual review—mandated when medical and exposure criteria are not satisfied, but also used to assess whether special circumstances might warrant greater compensation—the processing facility determines whether the claim would be compensable in the tort system, with valuation based on historical tort awards for similarly situated plaintiffs. *Id.* at 19-20. In the event of a dispute, claims are submitted to nonbinding arbitration, or, if that fails, to the courts, although such resolutions are reportedly rare. *Id.* at 21. Finally, after valuation, claims are paid based on a payment percentage on a first-in-first-out basis, subject to an annual cap on total compensation and, in some trusts, a claim ratio that reserves a certain percentage of annual compensation to claimants with the most serious diseases. *Id.* at 21-22. Under the TDPs, few trusts pay the full value of submitted claims: current payment percentages range widely, but the median is 25%, with most

As a quasi-administrative scheme, § 524(g) trusts have drawn considerable commentary.[13] While Congress sought to protect the interests of current claimants by requiring that 75% of them approve the trust, some have suggested that this provision, without the "cram down" otherwise available in bankruptcy, grants plaintiffs' attorneys a *de facto* veto over reorganization, allowing them to leverage concessions at the expense of other stakeholders.[14]  S. Todd Brown, *Section*

---

trusts paying between ten and forty-six percent of a claim's liquidated value.  *Id*. tbl. 4.4.

[13] *See, e.g.*, Todd R. Snyder & Deanne C. Siemer, *Asbestos Pre-Packaged Bankruptcies: Apply the Brakes Carefully and Retain Flexibility for Debtors,* 13 Am. Bankr. Inst. L. Rev. 801 (2005); Ronald Barliant et al.*, From Free-Fall to Free-for-All: The Rise of Pre-Packaged Asbestos Bankruptcies,* 12 Am. Bankr. Inst. L. Rev. 441 (2004); Mark D. Plevin et al., *Pre-Packaged Asbestos Bankruptcies: A Flawed Solution,* 44 S. Tex. L. Rev. 883 (2003).

[14] Another significant question that has received attention is the relationship between tort and trust compensation, which are linked in complex ways that vary from state to state.  *See* Dixon & McGovern, *Asbestos Bankruptcy Trusts and Tort Compensation*, *supra*, at 3-7 (outlining the linkages between the trusts and tort claims).  Some have contended that the confidentiality of the trust system allows claimants to "double-dip" in both the tort and trust system and permits reliance on dubious medical reports, while others have disagreed with this assessment. *See How Fraud and Abuse in the Asbestos Compensation System Affect Victims, Jobs, the*

16

*524(g) Without Compromise: Voting Rights and the Asbestos Bankruptcy Paradox*, 2008 Colum. Bus. L. Rev. 841, 856-70; *cf. In re Congoleum Corp.*, 426 F.3d at 680 & n.4 (noting that, in the absence of a cramdown provision, "[t]he realities of securing favorable votes from thousands of claimants to meet the 75% approval requirement [in 11 U.S.C. § 524(g)] forc[e] debtors to work closely with the few attorneys who represent large numbers of injured claimants."). Others criticize the voting procedure because it allows the more numerous holders of small claims to outvote those with mesothelioma and other serious injuries, who, unlike in a class action settlement, cannot opt out of the trust mechanism. *See* Nagareda, *supra*, at 20-21, 171-73. Our case law has acknowledged some of these concerns. In *Combustion Engineering*, we held that the use of a two-trust structure that granted current asbestos claimants "privileged treatment" prior to voting on the reorganization plan may have lacked both the "good faith" and "indicia of support" among creditors required by the Bankruptcy Code, as well as likely contravening the constitutional guarantee of procedural due process. 391 F.3d at 244-47. We also noted that the apparent preferential treatment granted to slightly impaired claimants

---

*Economy, and the Legal System: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 112th Cong. (2011) (presenting testimony on both sides of this question); U.S. Gov't Accountability Office, *supra*, at 29-33 (summarizing differing views and various proposals on whether and how trust claimant information should be made available to outside parties) .

was "especially problematic in the asbestos context, where a voting majority can be made to consist of non-malignant claimants whose interests may be adverse to those of claimants with more severe injuries." *Id.* at 244. A later case presented an allegation "of collusion between [the debtor] and the asbestos' claimants counsel" suggesting that the debtor had "sold out . . . insurers by setting up a system in which they would pay newly ginned-up silica claims in exchange for the asbestos claimants casting their votes in favor of the [Reorganization] Plan." *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 214 (3d Cir. 2011) (en banc). We characterized this assertion as a "profoundly serious charge . . . not without record support." *Id.*

Unlike in our earlier cases, these issues are not properly before us. Conflicts of interest or other procedural and structural deficiencies are properly raised in proceedings to confirm the reorganization plan. Nevertheless, London Market Insurers contend the plan here did not satisfy the confirmation requirements of 11 U.S.C. § 524(g) because the debtor employed complicated financial maneuvers to avoid adequate trust funding. But no objection was raised before the bankruptcy court in the confirmation proceedings, and we decline to entertain a collateral attack on a final, non-appealable judgment. Moreover, none of the parties here allege, nor does the record provide, evidence of collusion of the sort that was so troubling in *Combustion Engineering* and *Global Technologies*.

Furthermore, the trusts appear to have fulfilled Congress's expectation that they would serve the interests of

both current and future asbestos claimants and corporations saddled with asbestos liability. In particular, observers have noted the trusts' effectiveness in remedying some of the intractable pathologies of asbestos litigation, especially given the continued lack of a viable alternative providing a just and comprehensive resolution. Empirical research suggests the trusts considerably reduce transaction costs and attorneys' fees over comparable rates in the tort system. *Compare RAND Trust Report, supra,* at xiv & n. 1 (citing evidence that the claimants received 95% of trust expenditures, while limiting attorneys' contingent fees at around 25%), *with* Carroll, *supra*, at 98-103 (determining that in the tort system claimants ultimately received 42% of total spending on asbestos litigation, with contingency fee rates averaging 34% of claimants' recoveries), *and* Judicial Conference of the U.S., *supra*, at 3, 12-14 (noting that transaction costs in asbestos litigation exceeded victims' recoveries by nearly two to one). Recently, the trusts have required more rigorous medical evidence, and significantly reduced the valuation for non-malignant claims. Francis E. McGovern, *The Evolution of Asbestos Bankruptcy Trust Distribution Plans*, 62 N.Y.U. Ann. Surv. Am. L. 163, 171-74 (2006). Others have stressed that problems over the difficulty of reconciling competing interests of present and future claimants are not limited to the creation of § 524(g) trusts, but extend to the current state of asbestos and mass tort litigation generally. *See* Nagareda, *supra*, at 182 (observing that the "challenge" raised in *Combustion Engineering* of setting terms for both present and future claimants "is not limited to the bankruptcy context but . . . forms the fundamental problem posed by any peace

arrangement for mass tort litigation."). Nevertheless, we leave such systemic public policy questions to Congress.

In sum, section 524 trusts are the only national statutory scheme extant to resolve asbestos litigation through a quasi-administrative process. In function, the trusts are similar to workers' compensation or other administrative remedies that employ valuation grids to compensate injuries, subject to individualized and judicial review. Unlike those schemes, the trusts place the authority to adjudicate claims in private rather than public hands, a difference that has at times given us and other observers pause, since it endows potentially interested parties with considerable authority.

With this context, we turn to the specific facts of this case.

**B.**

On October 1, 2001, Federal-Mogul Global, Inc., one of the world's largest manufacturers of automobile parts, and over 150 affiliates filed Chapter 11 bankruptcy petitions in the District of Delaware. The principal purpose of the petitions was the resolution of Federal-Mogul's enormous asbestos-related liabilities. The company alleges that 500,000 personal-injury claims were pending on the petition date, with many more anticipated in the future, and asserts it expended over $350 million in the preceding year defending and indemnifying asbestos claims. *See generally In re Federal-Mogul Global, Inc.*, 300 F.3d 368, 372-73 (3d Cir. 2002) (describing the origins of the Federal-Mogul bankruptcy and

the "[t]ens of thousands" of asbestos claims against the debtor at issue on appeal).

In its proposed plan for reorganization, Federal-Mogul sought to obtain an injunction under 11 U.S.C. § 524(g) to channel present and future asbestos-related claims to a post-confirmation trust. The plan assigned various assets to the trust, including Federal-Mogul's rights to recovery under liability insurance. The plan also contained "insurance neutrality" provisions granting insurers the right to assert against the trust any defense to coverage already available under the policies, excepting only the defense that the transfer to the trust violated the policies' anti-assignment provisions.

Insurers here had issued liability policies to Federal-Mogul prior to bankruptcy. They objected to the plan's confirmation, asserting the plan violated the policies' anti-assignment provisions—standard clauses in liability policies that bar the insured from transferring the policies or insurance rights without the insurers' consent. *See* 2 Lee R. Russ, *Couch on Insurance* § 34:25 (3d ed. 2011). Federal-Mogul argued the anti-assignment provisions were preempted under 11 U.S.C. § 1123(a)(5)(B), which provides that a Chapter 11 reorganization plan shall provide adequate means for its implementation, potentially including transfer of estate property, "notwithstanding otherwise applicable nonbankruptcy law." The parties agreed to bifurcate the proceedings and resolve this issue separately, with the right to appeal the bankruptcy court's preemption judgment. On November 8, 2007, with all other objections resolved, the Bankruptcy Court confirmed the plan of reorganization, and

the District Court affirmed. The plan went into effect on December 27, 2007.

On March 19, 2008, the Bankruptcy Court issued its Preemption Order and Memorandum Opinion, holding the Bankruptcy Code preempted the anti-assignment provisions within the insurers' policies. *In re Federal-Mogul Global Inc*., 385 B.R. 560 (Bankr. D. Del. 2008). It reasoned that 11 U.S.C. § 541 permitted the assignment of the insurance rights to the bankruptcy estate, and 11 U.S.C. § 1123(a)(5) allowed transfer of the rights to the § 524(g) trust. *Id.* at 566-67 (citing *In re Combustion Eng'g*, 391 F.3d at 219 & n.27). It also relied on state insurance-law doctrine that assignment after the occurrence giving rise to liability does not violate anti-assignment provisions, since "there will be no additional risk to the insurance companies by virtue of the assignments." *Id*. at 567-71. The court also rejected a number of the insurers' contentions, holding that the presumption against preemption was inapplicable given the plain meaning of § 1123(a), that the preemptive scope of § 1123(a)(5) reaches private contracts, and that the asbestos insurance policies were not executory contracts subject to 11 U.S.C. § 365. *Id.* at 571-76.

The District Court affirmed. *In re Federal-Mogul Global*, 402 B.R. 625 (D. Del 2009). The Court first determined that the "notwithstanding" clause in § 1123(a) evinced clear congressional intent to expressly preempt conflicting state law. *Id.* at 631-32. It then turned to the scope of preemption, declining to entertain the insurers' various arguments to distinguish the holding in *Combustion*

*Engineering* and agreeing with the Bankruptcy Court that the case was dispositive on the question of whether § 1123(a) preempted insurance policies' anti-assignment provisions. *Id.* at 632-38. Although the court believed that this conclusion "effectively ends the matter," it went on to address insurers' statutory interpretation claims. *Id.* at 638. It distinguished as contrary to circuit precedent and plain statutory meaning a Ninth Circuit holding, rooted in legislative history, that limited the scope of § 1123(a) to that of a similar clause in 11 U.S.C. § 1142(a) preempting only nonbankruptcy law "relating to financial condition." *Id.* at 640-44 (citing *Pac. Gas & Elec. Co. v. Cal. ex. rel. Cal. Dep't of Toxic Substances Control*, 350 F.3d 932 (9th Cir. 2003)). Turning to the "parade of horribles" the insurers claimed would ensue from a broad preemptive reading,[15] the Court dismissed them as speculative and declined to construct a limiting principle when the relief sought fell "within the heartland of 1123(a)." *Id.* at 642-44 (citing *Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327, 341-342 (2002)). The court concluded by noting that the assignment of the insurance policies was consistent with public policy, since the contrary result would grant the insurers a windfall because "debtors with sizeable insurance assets could never avail themselves of

---

[15] The insurers alleged that a broad reading of § 1123(a) "would allow selling liquor to minors, trading with foreign enemies, dumping toxic wastes, retaining unlawful controlled substances such as drugs or explosives, or creating monopolies—all in contravention to federal or state laws." *In re Federal-Mogul Global, Inc.*, 402 B.R. at 642.

the very trust meant to alleviate" crushing asbestos liability. *Id.* at 644-45.

Certain Appellants and London Market Insurers timely appealed, and we consolidated their appeals.[16]

---

[16] We have jurisdiction over final judgments of a district court under 28 U.S.C. § 1291, and over district court judgments on appeal from a bankruptcy court under 28 U.S.C. § 158(d)(1). We review the bankruptcy court's order using the same standard the district court applies. *In re Cont'l Airlines*, 203 F.3d 203, 208 (3d Cir. 2000). The scope of preemption presents a pure question of law, which we review *de novo*. *Horn v. Thoratec Corp.*, 376 F.3d 163, 166 (3d Cir. 2004).

## II.

"It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)). State law may be preempted "by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) (citations omitted).

Two foundational principles of preemption jurisprudence inform our analysis. First, in every preemption case, "[t]he purpose of Congress is the ultimate touchstone," which "primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it," as well as from "the structure and purpose of the statute as a whole." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86 (1996) (internal quotation marks omitted; alteration in original). Second, we begin with a "presumption against pre-emption" rooted in the respect for states as independent sovereigns in our federal system. *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009). This presumption operates most forcefully when Congress legislates "in a field which the States have traditionally occupied," particularly "regulation of matters of health and safety." *Lohr*, 518 U.S. at 485 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

25

This "strong presumption against inferring Congressional preemption" also applies "in the bankruptcy context." *Integrated Solutions, Inc. v. Serv. Support Specialists, Inc*., 124 F.3d 487, 493 (3d Cir. 1997). The presumption may be overcome, however, where "a Congressional purpose to preempt . . . is clear and manifest." *Farina v. Nokia Inc*., 625 F.3d 97, 117 (3d Cir. 2010), *cert. denied*, 132 S. Ct. 365 (2011) (quoting *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 249 (3d Cir. 2008)) (internal quotation marks omitted).

**A.**

Insurers contend the disputed issue is one of first impression. Federal-Mogul argues, and the Bankruptcy and District Courts agreed, that our opinion in *Combustion Engineering*, 391 F.3d 190, determined that § 1123(a)(5) preempts anti-assignment provisions that would otherwise bar the transfer of insurance rights to a § 524(g) trust.

Like the present case, *Combustion Engineering* arose from the bankruptcy proceedings of a corporation that sought to channel asbestos-related liabilities to a § 524(g) trust funded in part through insurance. 391 F.3d at 204-07. As here, various of the debtor's insurers claimed assignment to the trust would violate the terms of their policies. *Id.* at 208. Unlike here, the plan at issue in *Combustion Engineering* involved the participation of non-debtor affiliates in the trust in return for a bar against asbestos claims, a provision we ultimately determined exceeded the scope of the bankruptcy court's jurisdiction. *Id*. at 227-38.

26

The preemption of anti-assignment provisions was not one of the paramount issues on appeal, *id.* at 202, but the question was raised in the proceedings below and the parties' briefs, and we discussed it briefly in a section on the appellate standing of London Market Insurers to challenge the reorganization plan. We held that, "[w]ith respect to the anti-assignment provisions, we agree with the District Court that even if the subject insurance policies purported to prohibit assignment of Combustion Engineering's insurance proceeds, these provisions would not prevent the assignment of proceeds to the bankruptcy estate." *Combustion Eng'g*, 391 F.3d at 218. In a footnote, we expanded:

> Section 541 effectively preempts any contractual provision that purports to limit or restrict the rights of a debtor to transfer or assigns [sic] its interest in bankruptcy. 11 U.S.C. § 541(c)(1) ("[A]n interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—(A) that restricts or conditions transfer of such interest by the debtor"). The Bankruptcy Code expressly contemplates the inclusion of debtor insurance policies in the bankruptcy estate. Section 1123(a)(5) provides:
>> Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall-
>> ...

27

> (5) provide adequate means for the plan's implementation, such as
>
> ...
>
> (B) transfer of all or any part of property of the estate to one or more entities, whether organized before or after the confirmation of such plan.

*Id.* at 218 n.27.

This statement is clearer in context. There was no dispute over whether Combustion Engineering could transfer its insurance rights to the bankruptcy estate, a right well-established under circuit law at the time. *See Estate of Lellock v. Prudential Ins. Co. of Am.*, 811 F.2d 186, 189 (3d Cir. 1987) ("We hold that an insurance policy is property of the estate within 11 U.S.C. § 541(a)(1)."). Rather, as we noted elsewhere in the opinion, the assignment issue hinged on whether Combustion Engineering could "contribute its rights to proceeds under certain insurance policies" to "the Asbestos PI Trust." *Combustion Eng'g*, 391 F.3d at 206; *see also id.* at 216 ("The Bankruptcy Court found the assignment of insurance proceeds to the Asbestos PI Trust did not impair the rights of insurers."). Further context comes from our stated agreement with the district court on this issue, since that court had held that the anti-assignment provisions did not

bar transfer to the trust.[17]  Moreover, although the language refers to the bankruptcy estate alone, the reference to Section 1123—which describes transfers from the estate to other "entities"—makes it clear that we contemplated transfers to a trust as well as inclusion in the estate, since the citation would otherwise be superfluous.  *See In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899, at *2 (Bankr. D.N.J. Sept. 2, 2008) (describing the "two stage analysis" necessarily implicated in *Combustion Engineering* requiring first transfer to the estate and then to the asbestos trust, and noting that "any other conclusion" would make the citation to § 1123(a)(5) "nonsensical").

As this context demonstrates, the question we addressed in *Combustion Engineering* was the same we confront here: whether a debtor could transfer its insurance rights to a § 524(g) trust notwithstanding the policies' anti-

---

[17] In its unpublished oral opinion, that court rebuffed the insurers' contention that the assignment of "insurance proceeds to the personal injury trust . . . violates anti-assignment provisions in their policies."  Transcript of Oral Opinion at 145, *In re Combustion Eng'g*, No. 03-10495 (D. Del. July 31, 2003).  It reasoned that, since contracts that provide for forfeiture in the event of bankruptcy are "void under Section 541 of the Code . . . . [i]f the insurers were correct in reading the anti-assignment provisions of Combustion Engineering's insurance policies to bar even a simple assignment of proceeds to a trust fund for claimants created by the reorganization, then these provisions, too, should be considered void."  *Id.* at 146.

assignment provisions.[18]    Footnote 27 sets forth our conclusion that any objection to the reorganization plan based

---

[18] Insurers' other attempts to distinguish *Combustion Engineering* are unavailing.    They suggest the term "proceeds" in the opinion referred only to liquidated insurance coverage, rather than insurance "rights," as are at issue here.    But the opinion itself refers to "rights to proceeds," and makes it clear that the actual value of many of Combustion Engineering's insurance policies "had yet to be determined."  *Combustion Eng'g*, 391 F.3d at 206 & n.11. Insurers also suggest that we would not have reached a different conclusion from the Ninth Circuit in *Pacific Gas* without more than a brief discussion in a footnote.    But *Pacific Gas* had been brought to our attention, Letter Pursuant to Rule 28(j) from Elit R. Felix, Esq., Counsel for Allianz Insurance, *In re Combustion Eng'g*, 391 F.3d 190 (3d Cir. May 27, 2004) (No. 03-3445), and it did not alter our conclusion.    We agree with the District Court that these contentions are at base an argument that we "did not mean what [we] said." *In re Federal-Mogul Global,* 402 B.R. at 637.

Insurers also claim that a broad reading of *Combustion Engineering* would conflict with our precedent in *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487 (3d Cir. 1997).    There, we held the Bankruptcy Code did not preempt state law restrictions on the transfer of tort claims.    *Id*. at 491-96.    Insurers argue that this transaction would be allowed under a broad reading of § 1123(a).    This assertion is incorrect.    The issue in *Integrated* was preemption

on the anti-assignment provisions could be overcome through a combination of § 541 and § 1123. Furthermore, in a recent en banc holding, we held that "the discussion of anti-assignment provisions in *Combustion Engineering* should suffice" to resolve whether insurance policies could be transferred to a personal-injury trust. *In re Global Indus. Techs.*, 645 F.3d at 212 n.27 (internal citations removed); *id.* at 218 n.4 (J. Nygaard, dissenting) ("[O]ur holding in *Combustion Engineering* . . . validated the Bankruptcy Code's authorization to preempt anti-assignment policy provisions."); *see also Motor Vehicle Cas. Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 671 F.3d 980, 1000 (9th Cir. 2012) (citing *Combustion Engineering* for the proposition that "Congress has expressly preempted Appellants' contract rights" restricting the transfer of insurance rights to a 524(g) trust), *amended by* --- F.3d ----, 2012 WL 1089503 (9th Cir. 2012); 7 *Collier on Bankruptcy* ¶ 1123.01[5] n.24 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009) (citing

---

under §§ 363(b)(1) and 704(1), neither of which contained an express preemption clause. 124 F.3d at 493. We contrasted these sections with "other provisions of the Bankruptcy Code" where Congress had employed "explicit language" that showed it "intend[ed] to displace state nonbankruptcy law ," particularly the "notwithstanding" clause contained in § 1123(a). *Id.* Moreover, the sale of the tort claim at issue in *Integrated* was not part of the reorganization plan, and so § 1123(a) was not applicable. *Id*. at 489-90.

*Combustion Engineering* for the proposition that § 1123(a)(5) preempts state law).[19]

Nevertheless, the proper scope of § 1123(a) was not the focus of the many disputes in *Combustion Engineering*, and our brief discussion of the provision did not examine the statutory language, structure, and legislative history of § 1123 for a thorough preemption analysis. We turn to these factors now.

**B.**

Section 1123 of the Bankruptcy Code establishes the contents of a plan for reorganization under Chapter 11. Subsection (a), at issue here, reads in part:[20]

---

[19] Numerous lower courts have also interpreted our holding this way, including both lower courts in this case. *See, e.g.*, *Hartford Acc. and Indem. Co. v. Global Indus. Technologies, Inc.*, No. 07-1749, 2008 WL 6838582, at *5-6 (W.D. Pa. July 25, 2008), *rev'd on other grounds sub nom. In re Global Indus. Technologies*, 645 F.3d 201 (3d Cir. 2011); *In re Kaiser Aluminum Corp.*, 343 B.R. 88, 94-95 (D. Del 2006); *In re W.R. Grace & Co.*, 446 B.R. 96, 132 n.59 (Bankr. D. Del. 2011); *In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899, at *1-2 (Bankr. D.N.J. Sept. 2, 2008); *In re Pittsburgh Corning Corp.*, 417 B.R. 289, 313 (Bankr. W.D. Pa. 2006).

[20] The entirety of § 1123(a) provides:

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

(1) designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests;

(2) specify any class of claims or interests that is not impaired under the plan;

(3) specify the treatment of any class of claims or interests that is impaired under the plan;

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

(5) provide adequate means for the plan's implementation, such as—

(A) retention by the debtor of all or any part of the property of the estate;

(B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;

(C) merger or consolidation of the debtor with one or more persons;

(D) sale of all or any part of the property of the estate, either subject to or free of

33

any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;

(E) satisfaction or modification of any lien;

(F) cancellation or modification of any indenture or similar instrument;

(G) curing or waiving of any default;

(H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;

(I) amendment of the debtor's charter; or

(J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;

(6) provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation referred to in paragraph (5)(B) or (5)(C) of this subsection, of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

. . .

     (5) provide adequate means for the plan's implementation, such as—

. . .

        (B) transfer of all or any part of the property of the estate to one or

---

equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends;

(7) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee; and

(8) in a case in which the debtor is an individual, provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan.

more entities, whether organized
before or after the confirmation of
such plan.

Besides the transfer of estate property, § 1123(a)(5)(A)-(J)
lists nine other transactions that can constitute "adequate
means" for plan implementation. Collier notes, "The types of
means listed in section 1123(a)(5) are clearly illustrative and
not exclusive." 7 *Collier on Bankruptcy* ¶ 1123.01[5].

"When a federal law contains an express preemption
clause, 'we focus on the plain wording of the clause, which
necessarily contains the best evidence of Congress'
preemptive intent.'" *Chamber of Commerce of U.S. v.
Whiting*, --- U.S. ----, 131 S.Ct. 1968, 1977 (2011) (quoting
*CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)).
The plain language of § 1123(a) evinces Congress's clear
intent to preempt state law.

The critical words here are "Notwithstanding any
otherwise applicable nonbankruptcy law . . . ." The Supreme
Court has held that a "notwithstanding" clause "clearly
signals the drafter's intention that the provisions of the
'notwithstanding' section override conflicting provisions,"
noting numerous instances when the courts of appeals "have
interpreted similar 'notwithstanding' language . . . to
supersede all other laws, stating that '[a] clearer statement is
difficult to imagine.'" *Cisneros v. Alpine Ridge Grp.*, 508
U.S. 10, 16 (1993) (alteration in original) (internal quotation
marks omitted) (quoting in part *N.J. Air Nat'l Guard v. Fed.
Labor Relations Auth.*, 677 F.2d 276, 283 (3d Cir. 1982), and

citing *In re FCX, Inc.*, 853 F.2d 1149 (4th Cir. 1988)). We have specifically cited § 1123(a) as an instance where Congress used "explicit language" to demonstrate its intent "to displace state nonbankruptcy law," *Integrated Solutions, Inc.*, 124 F.3d at 493, and two other courts of appeals have determined that the "notwithstanding" clause in § 1123(a) expressly preempts state law, *Pac. Gas*, 350 F.3d at 946; *In re FCX, Inc.*, 853 F.2d at 1154-55.

Our conclusion that § 1123(a) preempts state law does not end our inquiry, since we must still "identify the domain expressly pre-empted" by the statutory language. *Lohr*, 518 U.S. at 484 (quoting *Cippolone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992)). Even in instances of express preemption, the presumption in favor of state law applies, requiring us to accept "a plausible alternative reading . . . that disfavors pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005). Federal-Mogul argues that the plain text of § 1123 forecloses any alternative reading and requires a preemptive scope that reaches the transfer of insurance rights at issue here. But Insurers offer several limiting principles they contend construe § 1123 just as sensibly while comporting with traditional respect for state law.

Insurers first argue from the structure of § 1123(a). Section 1123(a) contains eight numbered subsections, (1)-(8), specifying the required elements of a reorganization plan. As discussed, under subsection (5) it also contains ten transactions, (A)-(J), that can constitute "adequate means for the plan's implementation" as required by § 1123(a)(5). These "means" include the "transfer of . . . the property of the

37

estate," § 1123(a)(5)(B), at issue here, but also, among others, the debtor's retention of estate property, (A); sale or distribution of estate property, (D); cancellation or modification of any indenture, (F); and curing or waiving of a default, (G).

Insurers propose a reading of § 1123(a) that excises § 1123(a)(5)(A)-(J) from the scope of § 1123(a), contending the "means" listed there are not subject to the "notwithstanding" clause. In other words, Insurers draw a sharp dichotomy between what they style as the "illustrative examples of *non-required* transactions" enumerated as adequate means and the rest of subsection § 1123(a). Br. for Certain Appellants at 24-25.

We disagree. It is hardly natural to read the "notwithstanding" clause in § 1123(a) as applying only to some, but not all, of subsection(a), an approach that contravenes any normal method of statutory interpretation. "The presumption is that the statute flows in orderly progression from general statement to specific instance so that ordinarily the qualification of a later clause upon an earlier one is to be expected." 1A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 20:7 (7th ed. 2007). This approach is also at odds with the interpretation of the Fourth Circuit, which held that, "[b]y its plain language," the "notwithstanding" clause encompassed § 1123(a)(5)(D). *In re FCX, Inc.*, 853 F.2d at 1154. It could hardly be read otherwise; no other express preemption provision is necessary. We also agree with the District Court that the contrary interpretation would have

38

absurd results: many of the means listed would be impossible to accomplish without preempting nonbankruptcy law.[21] For these reasons, we conclude the preemptive scope of § 1123(a) reaches all the provisions in subsection (a).

London Market Insurers further contend the phrase "otherwise applicable nonbankruptcy law" in § 1123(a) does not encompass private contracts. They note that elsewhere in the Bankruptcy Code Congress used language that explicitly preempts private contracts as well as governmental enactments. *See, e.g.*, 11 U.S.C. § 363(*l*) ("notwithstanding any provision in a contract, a lease, or applicable law"); 11 U.S.C. § 1124(2) ("notwithstanding any contractual provision or applicable law").

We agree with the District Court in rejecting this interpretation. Many of the transactions listed under §

---

[21] We also find relevant § 1123(d), which provides: "Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." The reference to subsection (a) indicates that, absent this provision, § 1123 would operate to preempt nonbankruptcy law governing the curing of defaults. The only reference to curing a default in § 1123 appears at § 1123(a)(5)(G), in the list of transactions that could constitute "adequate means." We find this strong evidence that Congress interpreted § 1123(a) to reach the ten transactions listed under § 1123(a)(5).

39

1123(a)(5) implicate contractual rights, and so demonstrate clear congressional intent that the phrase "nonbankruptcy law" encompass private contracts. The Fourth Circuit endorsed this view when it held that § 1123(a) preempts the contractual provisions of patronage certificates. *In re FCX, Inc.*, 853 F.2d at 1154- 55. Moreover, the Supreme Court has held that the phrase "all other law" in a preemption provision preempts private contracts. *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117 (1991). Since "[a] contract has no legal force apart from the [state] law that acknowledges its binding character," the Court concluded that the preemptive language at issue "effects an override of contractual obligations . . . by suspending application of the law that makes the contract binding."[22] *Id.* at 130. This

---

[22] London Market Insurers attempt to distinguish *Norfolk* on the ground that the collective bargaining agreement at issue in that case was required by law, a fact that played no role in the Court's reasoning or conclusions about the preemptive scope of the statute in that case. They also point to two other Supreme Court cases, *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992), and *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995), where the Court refused to apply preemption clauses to contract provisions. But in both cases, the Court specifically distinguished the language at issue in those cases—which spoke to state "requirements and prohibitions" and "enact[ments] and enforce[ments]" respectively—from the "all other law" provision in *Norfolk*. *Cipollone*, 505 U.S. at 526 n.24; *Wolens*, 513 U.S. at 229 nn.5-6. The *Wolens* Court also stressed that, in *Norfolk*, the railroad

reasoning applies to § 1123(a) and the insurance policies at issue. Accordingly, on the strength of statutory language and precedent, we conclude the phrase "otherwise applicable nonbankruptcy law" encompasses private contracts, including the insurance policies at issue here.

Insurers also claim that the context and structure of the Bankruptcy Code support a narrow reading of preemption. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (describing the interpretation of the Bankruptcy Code as "a holistic endeavor" where a single ambiguous provision "is often clarified by the remainder of the statutory scheme"). They point to other Code provisions they argue would be rendered superfluous by a broad interpretation of § 1123(a)'s scope, contending that Congress could not have intended § 1123 to make a hash out of a carefully defined and balanced statutory scheme.

As an initial matter, § 1123(a) by its express terms does not displace other portions of the Bankruptcy Code. Other Code provisions that place specific limitations on the satisfaction of a lien, 11 U.S.C. § 1129(b)(2)(A), on the curing of a default, *id.* § 365(b), on the issuance of securities notwithstanding certain securities laws, *id.* § 1145, or on the

reorganization scheme at issue would have been impossible to effect if collective bargaining agreements were not preempted—an argument readily analogized to the context of bankruptcy reorganization and private contracts. *Wolens*, 513 U.S. at 229 n.6.

use or sale of estate property, *id*. § 363(*l*), still operate to condition § 1123(a). [23] Had Congress wanted to limit the

[23] Moreover, we are unconvinced these provisions conflict with § 1123(a). 11 U.S.C. § 1145—which appears in the subchapter on "postconfirmation matters"—includes far more than those securities issued under a reorganization plan and encompasses numerous situations where § 1123 would not apply. 11 U.S.C. § 1129 places specific limitations on when a bankruptcy court may approve a plan, and so constitutes an unambiguous check on a debtor's power under § 1123. For instance, the statement in § 1123(b)(1) that "a plan may impair . . . any class of claims" is obviously not an untrammeled right, but subject to the careful procedure set out in § 1129 establishing when a plan may impair a claim without a creditor's consent. 11 U.S.C. § 365—which relates only to executory contracts and leases, not the entire range of potential defaults—is consonant with § 1123(d), described above, which limits the otherwise applicable scope of preemption under § 1123(a)(5)(G) concerning defaults. Finally, the authorization in 11 U.S.C. § 363(*l*) for the "use, sale, or lease of [estate] property" in a plan "notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor" is distinct from the transfer provision at 11 U.S.C. § 1123(a)(5)(B). Although neither "sale" nor "use" are defined terms in the Bankruptcy Code, the transfer of insurance rights from the debtor to the § 524(g) trust at issue here would constitute neither under the common and legal definitions of those terms. Sections 363(*l*) and 1123(a)(5)(B) also address

preemptive scope of § 1123 based on specific sections of the Bankruptcy Code, as Insurers suggest, it knew how to do so—the Bankruptcy Code features many instances when the exercise of a statutory right is expressly "subject to" the provisions of another part of the Code.[24] But rather than addressing the relationship between § 1123(a) and the rest of the Code clause-by-clause, Congress unambiguously limited the scope of the "notwithstanding" clause in § 1123(a) to "nonbankruptcy law," leaving other Code provisions intact.

---

different stages of the bankruptcy. As its location in the Code makes clear, § 363 focuses on the consequences of entering the bankruptcy process. It does not describe the requirements for proposing and approving a Chapter 11 reorganization plan, which are found in §§ 1121-1129. *See In re Federal-Mogul Global Inc.*, 385 B.R. at 572-73.

[24] Several such instances appear within § 1123 itself. *See, e.g.,* 11 U.S.C. § 1123(a)(1) ("[A] plan shall designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests"); *id.* § 1123(b)(2) ("[A] plan may[,] subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section"); *id.* § 1123(c) ("In a case concerning an individual, a plan proposed by an entity other than the debtor may not provide for the use, sale, or lease of property exempted under section 522 of this title, unless the debtor consents to such use, sale, or lease.").

Insurers particularly urge that a broad reading of the preemptive scope of § 1123(a) is inconsistent with 11 U.S.C. § 1142, which governs the implementation of the reorganization plan. Section 1142(a) provides, "Notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court."[25] Insurers argue it would be illogical for the scope of preemption in § 1123, which provides what the plan should contain, to exceed that provided for in § 1142, which provides for the plan's implementation, and so the two provisions must be read *in pari materia*.

This contention finds support in *Pacific Gas,* 350 F.3d 932, where the court confronted a bankruptcy reorganization plan that would have allowed the debtor, a public utility, to

---

[25] The District Court ruled that, even if § 1142(a) did apply, under the rule of the last antecedent the phrase "relating to financial condition" referred only to regulations and not a "law" or "rule." We agree with Insurers that in this instance this canon should not apply. *See Shendock v. Dir., Office of Workers' Comp. Programs*, 893 F.2d 1458, 1464 (3d Cir. 1990) ("[W]here the sense of the entire act requires that a qualifying word or phrase apply to several preceding or even succeeding sections, the word or phrase will not be restricted to its immediate antecedent." (quoting 2A N. Singer, *Sutherland Statutes and Statutory Construction* § 47.33, at 245 (4th ed. 1984))).

contravene state law by disaggregating. *Id.* at 935-37. The court limited the express preemptive scope of § 1123(a)(5) to that of § 1142(a)—that is, to state laws "relating to financial condition"—and remanded. *Id.* The court reached this conclusion based primarily on legislative history, which we will discuss, but also reasoned that importing the language of § 1142(a) into § 1123(a) made structural sense, because the two sections work in tandem: § 1123(a) establishes what a confirmable reorganization plan must contain, while § 1142(a) provides for the implementation of the plan. *Id.* at 946-48.

Although we regard *Pacific Gas* as factually distinguishable from this case,[26] we are also unconvinced that §§ 1123 and 1142 are so similar that they must be read together. *See Tooahnippah v. Hickel,* 397 U.S. 598, 606 (1970) (declining to read two sections dealing with the same subject *in pari materia* when "the coverage of these sections

---

[26] After briefing and oral argument in this case, the Ninth Circuit published an opinion holding that federal law preempts anti-assignment provisions that purport to bar the transfer of insurance rights to a § 524(g) trust. *In re Thorpe Insulation*, 671 F.3d at 999-1001. Distinguishing *Pacific Gas* and limiting its holding solely to the scope of § 1123, the court determined that 11 U.S.C. § 541(c) expressly preempts anti-assignment provisions and that 11 U.S.C. § 524(g) impliedly preempts them as an obstacle to congressional purposes. *Id.* Accordingly, even under Ninth Circuit case law, the anti-assignment provisions at issue here would be preempted.

45

is not identical"). Collier describes the plan provisions under § 1123 as "self-executing," 7 *Collier* ¶ 1123.01[5], which would seem to obviate the need for subsequent "implementation" under § 1142. Federal-Mogul suggests that, since § 1142 appears in a subchapter addressing "postconfirmation matters," it implicates a different stage in the bankruptcy proceeding from § 1123 and provides a post-confirmation safe harbor for certain actions taken in conformity with the plan. This interpretation is at least plausible, especially in light of the absence of any contrary case law examining preemption under § 1142(a).[27] Section 1142 is also distinguishable from § 1123 because it encompasses "orders of the court," suggesting that the limited

---

[27] The case law on preemption under § 1142(a) is sparse. The handful of relevant cases include *In re Sugarhouse Realty, Inc.*, No. 92-23024 SR, 1995 WL 114151 at *31-*32 (Bankr. E.D. Pa. March 15, 1995) (holding that under § 1142 the bankruptcy court may require specific performance when it might not be available under Pennsylvania law on the ground that applying state law "would eviscerate the language of 11 U.S.C. § 1142 and seemingly contravene the supremacy clause"); *In re Am. Freight Sys., Inc.*, 179 B.R. 952, 961 (Bankr. D. Kan. 1995) (rejecting a claim by a freight carrier that under § 1142 it may pursue certain post-confirmation claims prohibited by federal law); *In re Pearson Indus.,* 152 B.R. 546, 557 (Bankr. C.D. Ill. 1993) (holding that, while a debtor post-confirmation was generally expected to comply with "all applicable laws" like "any other business entity," § 1142 preempted parts of the Illinois Corporation Act).

preemptive language might serve primarily as a check on the court's authority to trump non-bankruptcy law in supplemental orders enacting the plan. Case law supports this interpretation, since nearly all of the cases construing § 1142 have involved the proper scope of the bankruptcy court's postconfirmation jurisdiction and authority.[28]

We need not resolve the scope of § 1142(a), however, because well-established principles of statutory interpretation militate against assimilating the two sections where Congress employed different words. "[W]here the legislature has inserted a provision in only one of two statutes that deal with closely related subject matter, it is reasonable to infer that the failure to include that provision in the other statute was deliberate rather than inadvertent." 2B *Sutherland Statutes and Statutory Construction* § 51.2. Thus, "limiting words" that appear in one provision are not ordinarily read into another that omits them, because we presume that "Congress

---

[28] *See, e.g.*, *Goodman v. Phillip R. Curtis Enters.,* 809 F.2d 228 (4th Cir. 1987) (limiting the authority of the bankruptcy court following confirmation of the plan to matters concerning implementation or execution); *Walnut Assocs. v. Saidel*, 164 B.R. 487 (E.D. Pa. 1994) (holding that subject matter jurisdiction is conferred on the bankruptcy court only to resolve postconfirmation matters); *In re Johns-Manville Corp.,* 97 B.R. 174 (Bankr. S.D.N.Y 1989) (determining that bankruptcy court retains postconfirmation jurisdiction over fundamental questions of the interpretation and administration of plan in the context of asbestos suits filed against debtor).

acts intentionally and purposely in the disparate inclusion or exclusion." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62-63 (2006) (quoting in part *Russello v. United States*, 464 U.S. 16, 23 (1983)).[29] Moreover, even if §§ 1123 and 1142 were properly read *in pari materia*, "where two statutes deal with the same subject matter, the more recent enactment prevails as the latest expression of legislative will." 2B *Sutherland Statutes and Statutory Construction* § 51.2. *Pacific Gas* reversed this presumption by making the reading of the 1984 amendment of § 1123 conditional on the *earlier* passage of § 1142 in 1978. We believe the logical course is to assume that Congress was aware of the preemptive language of § 1142 when it subsequently amended § 1123 to contain a preemptive provision with a different scope. Therefore, we decline to limit the preemptive scope of § 1123(a) to those state laws relating to financial condition.[30]

---

[29] A number of cases have applied this canon in the bankruptcy context. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 450 (1999) ("It is unlikely that the drafters of legislation so long and minutely contemplated as the 1978 Bankruptcy Code would have used two distinctly different forms of words for the same purpose"); *Rea v. Federated Investors*, 627 F.3d 937, 940-42 (3d Cir. 2010) (stating, in the context of two similar bankruptcy provisions, "[w]e will not contravene congressional intent by implying statutory language that Congress omitted").

[30] We find further support for this conclusion in 11 U.S.C. § 1123(d). As discussed above, subsection (d) establishes that,

In sum, we find no textual support to limit the scope of the "notwithstanding" clause only to part of § 1123(a), to state enactments, or to the preemptive reach of § 1142(a). The plain language of § 1123(a) evinces clear congressional intent for a preemptive scope that includes the transactions listed under § 1123(a)(5) as "adequate means" for the plan's implementation, including the transfer of property authorized by (a)(5)(B). The plain language also reaches private contracts enforced by state common law, and overcomes the presumption against preemption. As we will discuss, we do not believe that the scope is limitless, but it is broad enough to encompass the anti-assignment provisions of insurance policies that purport to bar transfer to a § 524(g) trust.

---

"[n]otwithstanding subsection (a) of this section," the amount necessary to cure a default under the plan is determined by applicable nonbankruptcy law. If subsection (a) only preempted nonbankruptcy law related to financial condition, such a proviso would likely be unnecessary, since a law defining the amount necessary to cure a default does not relate to financial condition, at least as that term is currently defined as analogous in meaning to insolvency, *see* 11 U.S.C. § 541(c)(1)(B) (invalidating restrictions of the transfer of property to the estate when "conditioned on the insolvency or financial condition of the debtor"); *In re Transcon Lines*, 58 F.3d 1432, 1439-40 (9th Cir. 1995); *In re Am. Freight Sys., Inc.*, 179 B.R. at 960.

**C.**

Insurers also urge a narrow reading of § 1123(a) on the basis of prior practice and legislative history. They suggest preemption deviates from pre-Code bankruptcy practice and should be disfavored, and legislative history establishes that Congress intended the 1984 revisions to the Code to be minor. But the evidence from these sources is too equivocal to overcome the plain meaning of the text, which provides compelling evidence of Congress's intent to preempt contrary non-bankruptcy law.

The legislative history of the "notwithstanding" clause in § 1123(a) is thin and inconclusive. Section 1123, enacted as part of the Bankruptcy Code in 1978, codified a similar provision at § 77B(b)(9) of the earlier Bankruptcy Act. *Pac. Gas*, 350 F.3d at 938. In its original form, § 1123(a) specified, as it does now, the elements a Chapter 11 reorganization plan shall contain, mandating that it provide "adequate means" including "the transfer of all or any of the property of the estate." An Act to Establish a Uniform Law on the Subject of Bankruptcies, Pub. L. No. 95-598, § 1123(a), 92 Stat. 2549, 2631-32 (1978). It contained no preemption provision. But § 1142(a), also enacted as part of the 1978 Bankruptcy Code, provided for the "execution" of a reorganization plan "notwithstanding any otherwise applicable nonbankruptcy law . . . relating to financial condition." *Id.* § 1142, at 2639. During debate, one senator read this preemptive language to encompass § 1123 as well, noting that under § 1123 "[i]f the [reorganization] plan is confirmed, then any action proposed in the plan may be taken

notwithstanding any otherwise applicable bankruptcy law in accordance with section 1142(a) of title 11." 124 Cong. Rec. 34,005 (1978) (statement of Sen. DeConcini).[31]

The addition of the clause "notwithstanding any otherwise applicable nonbankruptcy law" to § 1123(a) was first proposed in 1980, reintroduced in 1983, and enacted as part of the Bankruptcy and Federal Judgeship Act of 1984.

---

[31] The import of this statement is the cause of some debate. In *Pacific Gas*, the Ninth Circuit cited this as evidence that Congress intended §§ 1123 and 1142 to be read together. 350 F.3d at 941-42, 948. The District Court in this case rejected this view, citing "the inherent infirmity of relying on the floor remarks of a single senate subcommittee chairman as controlling authority," and instead stressed the importance of the difference in language between the two provisions. *In re Federal-Mogul Global,* 402 B.R. at 640-41 (citing *In re Pelkowski*, 990 F.2d 737, 743 (3d Cir. 1993)). This was particularly true, the District Court found, because Congress presumably had knowledge of the language of § 1142 when it altered § 1123 six years later, and chose not to adopt it. *Id.* We agree with the District Court that a statement by a single senator suggesting the preemptive scope of § 1123 in 1978 is not dispositive of its scope after modification in 1984. If anything , Senator DeConcini's statement seems to support the presumption that Congress acted purposefully in selecting different language for § 1123. *Cf. In re FCX, Inc.*, 853 F.2d at 1154 n.7 (citing Sen. DeConcini's statement to support the claim that § 1123(a) preempted the private contract restrictions at issue).

This modification occasioned little discussion. When originally proposed as part of a package of "technical amendments" intended to redress errors in "printing, spelling, punctuation, grammar, syntax, and numeration," the changes to § 1123 were described as "mak[ing] it clear that the rules governing what is to be contained in the reorganization plan are those specified in this section." H.R. Rep. No. 96-1195, at 1, 22 (1980). [32] In 1983, a Senate report described the amendment as making "technical stylistic changes." S. Rep. No. 98-65, at 84 (1983). The amendment, including the "notwithstanding" clause, passed the following year as part of a subsection labeled "Miscellaneous Amendments to Title 11." Pub. L. No. 98-353, Subtitle H, § 502, 98 Stat. 333, 367 & 385 (1984).

Insurers argue that the relative congressional silence on the amendment of § 1123 is telling. Courts will not presume a departure from pre-Code bankruptcy practice in the absence of clear congressional intent. *Hamilton v. Lanning*, --- U.S. ----, 130 S. Ct. 2464, 2473-74 (2010); *Cohen v. de la Cruz*, 523 U.S. 213, 221-22 (1998); *Pac. Gas*, 350 F.3d at 943-44. Insurers characterize pre-Code practice as requiring reorganization plans to conform to state law,

---

[32] Insurers point to this statement as evidence for their contention that preemption applies only to part of § 1123(a). But this brief sentence is too equivocal to prove much. It might also be reasonably interpreted to support the opposing conclusion that the rules specified in the section, including the transactions listed as "adequate means," are the only laws governing the contents of a reorganization plan.

arguing that an amendment characterized as "technical" and "stylistic" does not demonstrate congressional intent to substantially revise bankruptcy practice. This argument was endorsed by the Ninth Circuit in limiting the preemptive scope of § 1123 to laws relating to financial condition, *Pac. Gas*, 350 F.3d at 947, and it also finds support, Insurers claim, in the Supreme Court's ruling in *Cohen*, which found that a "stylistic change" enacted in the same 1984 amendments at issue here did not alter the meaning of a different provision of the Bankruptcy Code, 523 U.S. at 221.

We see no reason to question Insurers' account of pre-Code bankruptcy practice, which seems borne out by case law and commentary.[33] But we disagree with the inference that this practice, coupled with the thin legislative history of § 1123, establishes their proposed narrow preemptive scope for § 1123.

Pre-Code bankruptcy practice was not the law when the "notwithstanding" clause was added to § 1123 in 1984;

---

[33] *See, e.g.*, *Brocket v. Winkle Terra Cotta Co.*, 81 F.2d 949 (8th Cir. 1936) (refusing to allow the issuance of stock under a reorganization plan without adequate financial support required by state law); 6A *Collier on Bankruptcy* ¶10.19, at 89 & n. 8 (14th ed. 1977) ("Whatever the means chosen [for reorganization], it must be remembered that conformity with other applicable state or federal laws may be necessary. . . ."); Br. for Certain Appellants at 36 n.8 (collecting similar cases). We are unconvinced by Federal-Mogul's efforts to demonstrate that pre-Code practice was otherwise.

the existing law was the 1978 Bankruptcy Code. The 1978 Code substantially altered earlier practice, *see generally* David Skeel, *Debt's Dominion: A History of Bankruptcy Law in America* 131-83 (2001) (describing the Code's "transformative effect on bankruptcy as we know it"), including the addition of the preemptive language in § 1142 that modified prior practice and allowed the implementation of a plan notwithstanding some nonbankruptcy laws.[34] The fifteenth edition of Collier, which came out after the 1978 Code, broke with prior editions' admonition that a plan's terms may be required to conform to state law, and stated instead that under § 1123, "a plan may propose such actions notwithstanding nonbankruptcy law or agreements." *In re Kizzac Mgmt. Corp.,* 44 B.R. 496, 504 (Bankr. S.D.N.Y. 1984) (quoting 5 *Collier on Bankruptcy* ¶ 1123.01 [5] at 1123–10 (15th ed. 1979)). Case law from the period between 1978 and 1984 generally, although not unanimously, held that § 1123 preempted state law. *See In re Taddeo*, 685 F.2d 24, 29 (2d Cir. 1982) (holding that, since § 1123(a)(5)(G) provides the authority to cure a default in a Chapter 11 proceeding, "[a] state law to the contrary must fall before the Bankruptcy Code"); *Valente v. Sav. Bank of Rockville,* 34

---

[34] The addition of the "notwithstanding" clause in § 1142 was the only meaningful modification of that section from the corresponding Bankruptcy Act provision. 8 *Collier* ¶ 1142.LH. This constituted a substantial break from pre-Code practice: cases like *Brocket* would come out differently post-Code, since the state law at issue in that case related to the debtors' financial condition under § 1142(a).

B.R. 362, 365-67 & n.3 (D. Conn. 1983) (concluding that § 1123(a)(5)(G) allows for the curing of defaults notwithstanding state court judgments under the Supremacy Clause); *In re Kizzac Mgmt. Corp.,* 44 B.R. at 504 (holding that § 1123(a)(5)(E) grants the bankruptcy court the power to compel an assignment rather than a satisfaction of a mortgage).[35] *But see In re Celeste Court Apartments, Inc.*, 47 B.R. 470, 473-74 (D. Del. 1985) (finding no evidence in the unamended text of § 1123 or its legislative history that Congress intended it to upset a state court judgment on a defaulted mortgage). Taken together, this evidence suggests that the 1984 amendment did not mark a sharp break with earlier practice under the Code, but rather clarified and expanded the scope of preemption under § 1123. Notably, this conclusion was endorsed by the Fourth Circuit. *See In re FCX*, *Inc*., 853 F.2d at 1154 n.7 ("We do not understand the amendment [to § 1123(a)] to have effected a substantive change in prior law.").

But whatever the proper characterization of prior practice, it deserves little weight here. We decline to rely on it, or on a thin and vague legislative history that says nearly nothing about the intended preemptive scope of § 1123(a), to overcome the plain and unambiguous meaning of the words Congress chose. "As always, the most authoritative

---

[35] Insurers argue that *Valente* and *Kizzac* stand only for the proposition that the Bankruptcy Court may modify the rights of creditors. Certain Appellants Reply Br. at 20 n.8. Yet both courts analyzed the question presented under the Court's power under § 1123 to preempt state law.

indicators of what Congress intended are the words that it chose in drafting the statute." *United States v. Lavin*, 942 F.2d 177, 184 (3d Cir. 1991). Thus, "while pre-Code practice informs our understanding of the language of the [Bankruptcy] Code, it cannot overcome that language." *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 10 (2000) (internal quotation marks and citation omitted). "[W]here the meaning of the Bankruptcy Code's text is itself clear . . . its operation is unimpeded by contrary . . . prior practice." *Id.* (alteration and omissions in original) (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 546 (1994)). Here, Congress chose words that it employed throughout the Bankruptcy Code to mandate preemption, words the Supreme Court has interpreted as the clearest possible statement of preemptive intent. It would be an odd method of interpretation to rummage deep into the legislative history, and, finding practically nothing, conclude that this silence implies that Congress could not have meant what it said when it wrote the statute. The more sensible course reads the statutory text itself as indicative of congressional intent, which, based on the unambiguous language here, was to preempt nonbankruptcy state and federal law.

The Supreme Court's opinion in *Cohen* supports this view. There, the petitioner argued the 1984 addition of the phrase "to the extent obtained by" to 11 U.S.C. § 523(a)(2)(A), which barred discharge from liability for fraud, limited recovery from his estate to the actual amount of fraud and did not include the treble damages awarded by the bankruptcy court in an adversary proceeding. *Cohen*, 523 U.S. at 215. In rejecting this argument, the Court turned first

56

to the plain language of the provision, noting that the petitioner's proposed interpretation was at odds with both the "most straightforward reading" of the statute as well as the phrase's meaning in parallel provisions. *Id*. at 218-21. Only after exhausting the statute's wording did the Court turn to the provision's history, noting that, in addition to its description in the legislative history as only a "stylistic change," the language of the 1984 amendment "in no way signals an intention to narrow the established scope of the fraud exception." *Id*. at 221-22. "If . . . Congress wished to limit the exception [to the amount of actual fraud]," the Court continued, "one would expect Congress to have made unmistakably clear its intent." *Id*.

As this overview makes clear, the legislative history of the 1984 amendment to the Bankruptcy Code was a minor piece of corroborating evidence in an opinion that looked primarily to plain text of the provision to discern congressional intent. Fidelity to this approach in this case demonstrates that Congress made its intent clear. As we have discussed, the "most straightforward reading" of § 1123(a) cuts against Insurers' proposed narrow interpretation. Moreover, unlike the ambiguous amendment in *Cohen,* the addition of the "notwithstanding" clause to § 1123 is an "unmistakably clear" signal of congressional intent to preempt that overcomes any inference based on passing references to "technical" or "stylistic" changes. In short, we believe *Cohen* mandates rather than undermines an interpretation derived from a statute's plain text.

Having examined the history of § 1123, we find nothing that indicates we should read its preemptive scope narrowly. While pre-Code practice may suggest that historically courts did not allow a reorganization plan to preempt contrary state law, the 1978 Code altered that prior practice. The thin legislative history of the 1984 amendment of § 1123 characterizing the change as "stylistic" and "technical" does not overcome the plain and explicit language of the preemption provision. That language unambiguously provides for preemption, at least in this context, and we give its meaning effect.

## D.

Although our discussion resolves the legal question before us, it bears noting that preemption here furthers the purposes of the Bankruptcy Code. The debtor here seeks to use its existing assets to address current and future claims arising out of past occurrences and resolve its asbestos liability, a goal consonant with the "fresh start" purpose of bankruptcy. Because a 524(g) trust is created only through a Chapter 11 proceeding, a contractual limitation on the assignment of the debtors' property to a trust functions analogously to contract provisions that alter a debtor's rights in the event of insolvency. Such provisions are preempted under 11 U.S.C. § 541(c)(1)(B), which provides that "an interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law . . . that is conditioned on the [debtor's] insolvency." The purpose of this provision is to prevent creditors and others from

58

employing a debtor's bankruptcy filing to diminish post-filing contractual rights. Its inclusion in the Code establishes that preemption in this instance—where the transfer of insurance rights corresponds with the transfer of the debtor's preexisting liabilities into an asbestos trust authorized by the Code—furthers the purposes of bankruptcy. *Cf. In re Thorpe Insulation*, 671 F.3d at 1000 (holding that § 541(c) itself preempts anti-assignment provisions that bar transfer to a 524(g) trust).[36]

Preemption in this instance also furthers the purposes of 11 U.S.C. § 524(g). Congress created 524(g) as the best course to harmonize the interests of asbestos claimants and reorganized debtors alike. *See* H.R. Rep. No. 103-835, at 46-48 (1994). This approach would "help asbestos victims receive maximum value," 140 Cong. Rec. 28,358 (1994) (statement of Sen. Heflin), but also ensure a company's continued profitability, converting it into the "goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims," *id.* at 8,021 (statement of Sen. Brown). The trust mechanism furthered "the fundamental rationale of chapter 11, that a reorganized debtor emerges from bankruptcy free and clear other than the liability set by the plan." *Id.*; *see also* H.R. Rep. No. 103-835, at 47 (noting that the uncertainties surrounding asbestos-related bankruptcies had "undermined the 'fresh start'

---

[36] Federal-Mogul did not argue either before the District Court or on appeal that the trust is part of the estate, as the Ninth Circuit concluded in *Thorpe*.

objectives of bankruptcy"). As these statements demonstrate, Congress believed the transfer of a corporation's assets to a trust to ensure the equitable compensation of present and future claimants, in return for a release from future liability, served the "fundamental" purposes of bankruptcy. The anti-assignment provisions at issue would impede these objectives by depriving both debtors and claimants access to assets specifically intended to compensate for potential losses. In these circumstances, construing § 1123(a) to preempt these contracts is consonant with congressional intent and public policy. *Cf. In re Thorpe Insulation*, 671 F.3d at 1000-01 (holding that anti-assignment provisions barring transfer to a trust are impliedly preempted because they are an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting § 524(g)).

Insurers argue, however, that the anti-assignment provisions serve an important purpose in protecting them from covering a risk different from the one they bargained for. Although insurance neutrality language in the reorganization plan preserves all other defenses to coverage, Insurers contend that the transfer here nonetheless increases their exposure because the trust allows claims that would be barred in the tort system.

We doubt whether transfer in this instance materially alters Insurers' risk. The bankruptcy here shifted debtor's asbestos-related liabilities—based on events which had already occurred and for which the insurers were already potentially responsible—to the post-confirmation trust. We have questioned whether such a transfer in the asbestos

context changes the risk an insurer agreed to cover.[37] *See Global Indus. Techs., Inc.*, 645 F.3d at 212 (observing that in the *Combustion Engineering* reorganization plan, "the pre-petition quantum of asbestos liability was known from four decades of asbestos litigation, and moving the pre-petition asbestos claims out of the tort system and into a trust system did not increase in any meaningful way the insurers' pre-petition exposure to asbestos liability."); *see also* 3 *Couch on Insurance* § 35.8 ("The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity."). Here, both the District and Bankruptcy Court strongly challenged Insurers' argument that their risk was substantially altered. *In re Federal-Mogul Global, Inc.*, 402

---

[37] *Global Industrial Technologies* found that insurers' risk altered when a reorganization plan's creation of a Silica Trust expanded the number of silica claims from 169 to over 4,600, a twenty-seven-fold increase, and when there was substantial evidence of collusion. 645 F.3d at 213-14. No record evidence supports a similar finding here. Instead, Insurers argue transfer to the asbestos trust increases their risk solely because it may "put[] administration of the trust and claims resolution process in the hands of plaintiffs' lawyers" or may "pay[] claims that would not be entitled to payment in the tort system." Br. for Certain Appellants at 53-54; *see also* LMI Br. at 14-16. These bare assertions do not rise to the exceptional and well-documented increase in risk we found in *Global Industrial Technologies*.

B.R. at 645 ("Appellants have no economic incentive to prevent this assignment, particularly whereas here, the events creating exposure to asbestos liability have already occurred."); *In re Federal-Mogul Global, Inc.*, 385 B.R. at 567-69 (collecting cases to establish that "[i]n this case, to the extent that the events giving rise to liability have already occurred, there will be no additional risk to the insurance companies by virtue of the assignments. Coverage issues . . . are all preserved."). Insurers have presented no evidence that the transfer here alters their risk except, perhaps, through the procedural shift that provides recovery through Trust Distribution Protocols rather than through the tort system. Significantly, those TDPs are mandated by Congress for asbestos trusts and must be approved by the bankruptcy court. 11 U.S.C. § 524(g)(2)(B)(ii)(V). We cannot seriously entertain a claim that the insurers had a contractual right to a particular public policy. If, as has been proposed, Congress removed all asbestos claims to a nationwide asbestos trust that could recover from Federal-Mogul and other responsible parties, with procedures identical to those currently provided in the § 524(g) trusts, the insurers would have no anti-assignment claim. As this hypothetical demonstrates, Insurers' true objection seems to be against the public policy Congress chose to enact.[38]

---

[38] Insurers also urge that the anti-assignment defense is no different from the other defenses specifically preserved to them under the plan's insurance neutrality, and so should also be preserved. We disagree. Insurers could have offered the fact-specific coverage defenses preserved to them in any

Insurers also allege the trust mechanism might distort ordinary incentives between insurer and insured, encouraging the debtor to collude with claimants and impose costs on the insurer. But as Federal-Mogul points out, this shift in incentives is not unique to the asbestos context and occurs in bankruptcy where there is a discharge of the liability of the debtor but not that of the insurer. *See* 11 U.S.C. § 524(e) ("[D]ischarge of the debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."). Nor do the Insurers provide any evidence of such collusion in this case. Such bare speculation does not establish an increase in risk.

Although not present here, there may be circumstances where the creation of a trust does alter an insurer's exposure—for instance, when its mere existence attracts dramatically more claimants—although this is less likely given the lengthy history of asbestos liability. *See In re Global Indus. Techs., Inc.*, 645 F.3d at 212 (detailing how the creation of a silica trust alone "staggeringly increased—by more than 27 times—the pre-petition liability exposure," while distinguishing the asbestos context because the

_____

asbestos proceeding prior to bankruptcy. By contrast, the anti-assignment defense here would exist only after and by virtue of the bankruptcy reorganization, and could be invoked by an insurer against any claim by the Trust, no matter how meritorious. Moreover, to the extent a determination rested on the legitimacy of the TDPs as a method of adjudication, it could invite courts to second-guess the judgment of Congress and the bankruptcy court.

quantum of liability has been established from "four decades of asbestos litigation."). As our precedent has also recognized, there may also be instances where the evidence suggests possible collusion between the debtor and the claimants. *See id.* at 214. But granting a private party powerful leverage that may amount to a *de facto* veto over the reorganization proceeding does not seem a promising solution to these potential problems. *Cf. In re Thorpe Insulation Co.*, 671 F.3d at 1001 ("[E]nforcing the anti-assignment provisions would subject virtually all § 524(g) reorganizations to an insurer veto").

Congress sought to address these issues when it enacted § 524(g) by codifying the "exceptional precautions at every stage of the proceeding" employed in the original Manville case. H.R. Rep. No. 103-835, at 47. Section 524(g) accordingly contains many requirements that must be satisfied before such a trust can be approved. *See Combustion Eng'g*, 391 F.3d at 234 & n.45. In conjunction with the requirements for plan approval and the rest of the Bankruptcy Code, these provisions are intended to protect the interests of all affected parties. *Id.* We recently ruled that insurers have standing to participate in bankruptcy proceedings when the creation of a trust "staggeringly increase[s]" insurers' risk and exposure. *In re Global Indus. Techs., Inc.*, 645 F.3d at 204, 212; *see also In re Thorpe Insulation*, 671 F.3d at 999 (holding that insurers have bankruptcy standing "to participate in the proceedings culminating in approval of [a] § 524(g) plan"). We have redressed procedural deficiencies in asbestos-related bankruptcies that did not adequately satisfy the requirements

of the Code, including § 524(g). *In re Congoleum Corp.*, 426 F.3d at 687-93; *In re Combustion Eng'g*, 391 F.3d at 233-48. As these examples underscore, we believe careful consideration of the protections of the Bankruptcy Code, together with traditional requirements of procedural due process, adequately guard the interests of all affected parties.

## III.

Insurers raise hypotheticals proposing scenarios where Chapter 11 debtors might employ the Bankruptcy Code to avoid the strictures of federal or state law, and argue Congress could not have intended this absurd result. Because the Bankruptcy Code clearly provides preemption in this instance, we need not decide whether it would also be proper in the situations imagined by Insurers. Nonetheless, we would find problematic attempts under § 1123(a) to disregard large swaths of state and federal regulatory schemes. *Cf. Pac. Gas*, 350 F.3d at 937 (rejecting an "across-the-board, take-no-prisoners preemption strategy" in which the debtor, a public utility, sought to disaggregate notwithstanding contrary state law under § 1123(a), thereby avoiding regulation by the California Public Utility Commission). Eighteen states have previously filed an amicus brief with us on this issue, cautioning that an "overly broad reading" of § 1123(a) "would destroy [their] ability to preserve their regulatory authority in the face of a bankruptcy filing." Br. and App. of Amicus Curiae States at 1-3, *In re Global Indus. Techs., Inc.*, 645 F.3d 201 (3d Cir. 2011) (No. 08-3650), 2008 WL 8134099 at *1-*3.

But the scope of preemption under § 1123(a) is not unlimited, and our holding does not suggest otherwise. Any reorganization plan must still comply with all aspects of the Bankruptcy Code and be approved by the bankruptcy court. In particular, it must satisfy 11 U.S.C. § 1129(a)(3), which provides that a court shall confirm a reorganization plan only if it "has been proposed in good faith and not by any means forbidden by law." We have stated that this good faith standard ensures that a plan will "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)).

Moreover, although the text of § 1123(a) does not explicitly state a limitation on its preemptive scope, well-established principles suggest that its scope is not unbounded. One important restriction is the long-standing presumption against preemption of state police power laws and regulations rooted in "federalism concerns and the historic primacy of state regulation of matters of health and safety." *Lohr*, 518 U.S. at 485. The Supreme Court relied on similar principles to hold that the trustee of a debtor in Chapter 7 liquidation proceedings could not abandon property in contravention of state environmental law, despite enjoying the authority under 11 U.S.C. § 554(a) to abandon "any property of the estate that is burdensome to the estate." *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494 (1986). Notwithstanding the language of the statute, the Court reasoned that Congress did not intend the abandonment power under § 554 to preempt all state laws, citing as evidence pre-Code practice,

the Bankruptcy Code's general solicitude for state safety and health regulations, and congressional interest in enforcing similar laws. *Id.* at 500-07. Although prior practice is more mixed in this case,[39] the other justifications the Court invoked to construct a common-law limitation also apply to § 1123(a). In *Montgomery County, Md. v. Barwood, Inc.*, 422 B.R. 40 (D. Md. 2009), the District of Maryland applied the Court's holding in *Midlantic*, as well as other relevant precedent, to the preemptive scope of § 1123(a). It concluded that "§ 1123(a) does not preempt otherwise applicable nonbankruptcy laws that are concerned with protecting public health, safety, and welfare." *Id*. at 47.

The anti-assignment provisions at issue here do not implicate public health, safety, and welfare. But limitation of § 1123(a)'s preemptive scope on these grounds is sensible, and seemingly consonant with congressional intent, the purposes of the Bankruptcy Code, and precedent. It has often been noted that the Code exists not to provide a "haven for wrongdoers," but to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh." *In re Davis*, 194 F.3d 570, 573-74 (5th Cir. 1999) (quoting in part *Local Loan Co. v. Hunt*, 292 U.S. 234, 244

---

[39] At oral argument, Insurers distinguished *Midlantic* on this basis. Tr. of Oral Arg. at 76, Nov. 9, 2011. But, as noted, prior practice was only one of three grounds for the Court's decision. Moreover, under the Insurers' characterization of prior practice—one which, as discussed above, we regard as accurate in part—the logic the Court employed in *Midlantic* would control here as well.

(1934)).  Extending the well-established presumption against preemption of state police powers to § 1123(a) seems to balance these aims, and might also forestall some of the more problematic hypotheticals advanced by Insurers.

## IV.

For the foregoing reasons, we hold that the anti-assignment provisions in the relevant insurance policies are preempted by § 1123(a)(5)(B) to the extent they prohibit transfer to a § 524(g) trust.  We will affirm the judgment of the District Court.