# United States Court of Appeals
## For the First Circuit

No. 14-1281

NORA M. BARRAFORD, individually and as executrix of the estate of
Daniel M. Barraford, by her agent THE FEDERAL-MOGUL ASBESTOS
PERSONAL INJURY TRUST,

Plaintiff, Appellant,

KATHERINE LYDON, individually and as executrix of the estate of
John T. Lydon, Jr.,

Plaintiff,

v.

T&N LIMITED, f/k/a T&N PLC, f/k/a Turner & Newell Plc, f/k/a
Turner & Newell Limited; TAF INTERNATIONAL LIMITED, f/k/a Turners
Asbestos Fibres Limited, f/k/a Raw Asbestos Distributors Limited,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Kayatta, Circuit Judges.

Richard Levin, with whom Rowan D. Wilson and Cravath,
Swaine & Moore LLP were on brief, for appellants.
Mark A. Perry, with whom Scott P. Martin, Lindsay S. See,
Gibson, Dunn & Crutcher LLP, Bruce F. Smith, Steven C. Reingold,
Timothy J. Durken, and Jager Smith P.C. were on brief, for
appellees.

February 11, 2015

**KAYATTA, <u>Circuit Judge</u>.** Appellee T&N[1] was an asbestos manufacturer that faced significant liability after the deadly qualities of its product became clear. Like many other asbestos manufacturers, it chose to address this liability through a Chapter 11 bankruptcy reorganization plan (the "Plan"). T&N's Plan, among other things, created the Federal-Mogul Asbestos Personal Injury Trust (the "Trust"). The Plan transferred to the Trust certain of T&N's assets and rights, with which the Trust was to pay asbestos claims brought by persons who could have sued T&N but for its bankruptcy. While bankruptcy reorganization plans typically discharge all of a reorganizing company's liability upon plan confirmation, this Plan provided that T&N's asbestos liability would continue post-confirmation, and that the Trust would bring asbestos suits against T&N as the agent of the actual claimants. The purpose of this provision was to allow the Trust to take advantage of a particular T&N insurance policy.

In this lawsuit filed in 2011, the Trust brought an asbestos claim that had accrued roughly a decade earlier. When T&N raised a statute of limitations defense, the Trust argued that the reorganization Plan allows it to bring this claim (and any other asbestos claims that had not become stale prior to T&N's filing for bankruptcy protection) whenever it wishes to do so until all of the

---

[1] We use the singular name "T&N" to refer collectively to the appellees T&N Limited and TAF International Limited.

proceeds of T&N's insurance policy are exhausted. The district court disagreed. Having reviewed the Plan documents and relevant provisions of the Bankruptcy Code, we now affirm the district court's dismissal of the Trust's suit on statute of limitations grounds.

## I. Background

### A. The Barraford Claims

Daniel Barraford died in 2002 of mesothelioma, a cancer generally caused by asbestos inhalation. Barraford had been exposed to asbestos products manufactured by T&N, among others, when he worked as an electrician and engineer on the construction of the Prudential Center in Boston, Massachusetts. In 2004, his widow Nora Barraford brought suit against a number of asbestos manufacturers on her own behalf and as executrix of his estate. Barraford did not name T&N as a defendant because T&N had filed in 2001 for protection under Chapter 11 of the United States Bankruptcy Code (the "Code"). 11 U.S.C. §§ 101 et seq. Under the Code, the filing of a bankruptcy petition triggers a so-called automatic stay that bars the commencement of suit against the debtor on any claim "that arose before the commencement of the [bankruptcy] case." Id. § 362(a)(1). The stay covered Barraford's claims because, for bankruptcy purposes, any claim for personal injury arising from exposure to a product arises when the claimant

-5-

was first exposed to the product.  See In re Grossman's, Inc., 607 F.3d 114, 125 (3d Cir. 2010) (en banc).

Under Massachusetts law, Barraford's state-law claims would have expired at the latest in 2005, three years after his death.  Mass Gen. Laws ch. 229, § 2; ch. 260, § 2A.  The Code, however, delays the expiration of any limitations period that would otherwise end during the duration of the automatic stay until thirty days have passed after notice of termination of the stay. 11 U.S.C. § 108(c)(2).  The question posed by this case is whether that stay was terminated no later than December 27, 2007, the effective date of T&N's reorganization Plan,[2] such that the Barraford claims became time-barred thirty days thereafter, or whether the Plan modified and extended the stay indefinitely, such that the claims were not time-barred when this suit was brought in 2011.  The answer to this question lies primarily in the language of the Plan.

## B.  The T&N Reorganization Plan

To explain the pertinent terms of T&N's reorganization Plan, we focus first on its creation of the Trust.  A personal injury trust is a special tool authorized by Congress for dealing with the long latency period of mesothelioma.  See 11 U.S.C.

_____

[2]  T&N does not concede that its non-asbestos liability was discharged on the Plan's effective date, rather than November 8, 2007, when the bankruptcy court entered its order confirming T&N's reorganization Plan.  However, we need not pick between these two dates as the correct answer is irrelevant to this appeal.

-6-

§ 524(g); In re Federal-Mogul Global Inc., 684 F.3d 355, 357-59 (3d Cir. 2012). A trust allows a reorganizing asbestos manufacturer to wash its hands of further asbestos liability by, in addition to satisfying other statutory requirements, assigning all liability for asbestos claims to the trust and conveying at least fifty percent of its equity (or the right to acquire that equity) to the trust. Id. § 524(g)(2)(B). Customarily, or so the parties tell us, a reorganizing company also assigns any applicable insurance policies to the trust. See, e.g., In re Federal-Mogul, 684 F.3d at 366-67, 382. Upon plan confirmation, the reorganized manufacturer receives a discharge of all liability for the claims. 11 U.S.C. §§ 944(b)(1), 1141(d). Current and future claimants then proceed solely against the trust. Id. § 524(g)(1)(B).

Here, we are told, two impediments to this customary course loomed. First, a £500 million liability policy owned by T&N (the "Hercules Policy") could not be assigned to the Trust under controlling United Kingdom law. Second, no proceeds under the Hercules Policy could be reached until T&N satisfied a "self-insured retention" (basically, a deductible) of £690 million.[3] In order to try to get around these impediments, the Plan adopted an arrangement that the parties tell us is in some significant respects unusual. We briefly summarize that

---

[3] In a 2004 disclosure statement, T&N indicated it had already paid claims totaling £387 million.

arrangement, albeit ignoring for a moment any twists created by statute of limitations issues.

First, although confirmation of a reorganization plan typically discharges the reorganized company's liability, 11 U.S.C. § 1141(d)(1), see also United States v. White, 466 F.3d 1241, 1245 (11th Cir. 2006), Plan § 4.5.6 instead provides that the liability of the so-called "Hercules-Protected Entities," including T&N, would "continue in full" for asbestos claims until the Hercules Policy is exhausted (the "Hercules Policy Expiry Date").[4]

---

[4] The Plan provisions read, in relevant part, as follows:

> **4.5.6.  Limited Recourse to assets of Reorganized Hercules-Protected Entities.**  On and from the Effective Date until discharge and release under Section 4.5.20 of the Plan, any liability of the Reorganized Hercules-Protected Entities for Asbestos Personal Injury Claims . . . shall continue in full . . . .
>
> **4.5.20.  Discharge of liability for Debtor HPE Asbestos Claims . . .**
>
> (a) From and after the Hercules Policy Expiry Date,
>
> > (i) the Trust will assume sole and exclusive liability for all remaining Asbestos Personal Injury Claims (whether then existing or at any time in the future coming into existence) against the Reorganized Hercules-Protected Entities . . . ;
> >
> > (ii) the Reorganized Hercules-Protected Entities shall automatically and without further order of court be discharged and released from any and all liability with

Second, the Plan precludes the claimants themselves from actually bringing any asbestos claims against T&N. Plan § 4.5.7(a). Rather, the Plan assigns all of the asbestos claims to the Trust, which is then allowed to sue T&N as agent for the claimants. Plan § 4.5.8(a). The Plan allows such claims to proceed "in the ordinary course to judgment or settlement." Plan § 4.5.8(f)(ii). The Plan also provides that when the Trust brings such claims, T&N refers the Trust to its insurers, who control the defense. Plan § 4.5.8.(f)(i). Hence, the Trust brings this action as agent for Barraford against T&N, whose defense is managed by its insurers.

Third, to the extent that the Trust prevails in a claim against T&N, its recovery initially takes the form of a reduction in a £338 million payment obligation to T&N under a twenty-year stock subscription agreement. Plan §§ 4.5.5, 4.5.10(a)(i). (This agreement is, in part, how the Trust acquired the fifty percent equity in the reorganized company required by the Bankruptcy Code.[5]) When the self-insured retention is satisfied, the Trust

> respect to Asbestos Personal Injury Claims (whether then existing or at any time in the future coming into existence . . . ).

[5] On the Plan's effective date, T&N's parent company issued to the Trust 50.1 million shares of Class B Common Stock, 57.5% of which would be distributed pursuant to the subscription agreement. Plan §§ 8.3.4, 4.5.5. The Plan also provided for the immediate sale to an investor of an option on the shares that the Trust

-9-

may seek recovery directly from the Hercules Policy. Plan §§ 4.5.3, 4.5.10(a)(iv). Upon the Hercules Policy Expiry Date--essentially, the date on which the self-insured retention is met and the £500 million policy is exhausted--T&N will "be discharged and released" from all asbestos liabilities. Plan § 4.5.20(a)(ii).

Fourth, the Trust's net assets are used to pay those claimants who successfully pursue an administrative claim through a process defined in the Trust Distribution Procedures. Plan §§ 4.5.1, 4.5.2. As best we can tell, under these procedures, Barraford's recovery from the Trust is not contingent on the Trust's recovery from T&N. At the same time, all claimants, including Barraford, presumably have an interest in the Trust's ability to prevail on enough claims so as to eliminate the Trust's debt to T&N and exhaust the Hercules Policy.[6]

The parties' briefs substantially share this characterization of the Plan. Where they differ is on the question of when the Trust needed to have brought asbestos claims against T&N that would have been stale but for the automatic stay. The Trust argues that the intent of the Plan was to preserve all asbestos claims for as long as it takes to exhaust the Hercules

received outright. Plan § 8.3.6.

[6] The parties' briefs are sparing, at best, in describing exactly how the administrative claim process works and exactly what the practical ramifications of this litigation will be.

Policy.  T&N argues that the Plan contains nothing that would extend applicable limitations periods, so claims had to be filed before their limitations periods expired or, if that period expired during the bankruptcy proceedings, then within thirty days of notice of the Plan's effective date.  We are told by counsel for the Trust that there may be thousands of claims that the Trust did not file in time to qualify as timely under T&N's reading of the Plan.[7]

## C.  **The Present Suit**

On November 22, 2011--nine years after Daniel Barraford's death and more than three years after the Plan became effective--the Trust filed suit against T&N in Massachusetts state court, asserting negligence, breach of warranties, wrongful death, and other tort claims on behalf of Nora Barraford and her husband's estate.  T&N removed the case to the United States District Court for the District of Massachusetts.[8]  T&N moved for judgment on the

---

[7] The record shows that between August 2010 and June 2012, the Trust received nearly 50,000 claims it determined were compensable, including over 5,000 compensable mesothelioma claims, out of nearly 350,000 claims filed.  The Trust does not offer data indicating how many of those claims would be untimely under T&N's reading of the Plan.

[8] For purposes of pretrial discovery only, the case was consolidated under Fed. R. Civ. P. 42(a) with another suit brought by the Trust on behalf of another mesothelioma victim who had worked on the Prudential Center.  Lydon v. T&N Ltd., 12-cv-10013-FDS (D. Mass. June 23, 2014).  The victim in the Lydon case died in 2010 and T&N did not argue that his claims were time-barred, so that case proceeded to jury trial.  On June 20, 2014, the jury returned a verdict for the plaintiff and awarded

-11-

pleadings under Fed. R. Civ. P. 12(c), arguing that the Trust's suit was barred by Massachusetts' three-year statute of limitations. Mass. Gen. Laws ch. 260, § 2A; ch. 229, § 2. Treating the motion as one for summary judgment, as is allowed by Fed. R. Civ. P. 12(d), the district court granted T&N's motion, holding the claims time-barred. Barraford v. T&N Ltd., 17 F. Supp. 3d 96, 104 (D. Mass. 2014). The Trust appealed. It argues that the interaction of the Code and the Plan preserved Barraford's claims through the continued operation of the automatic stay imposed by Code § 362(a).

## II.  Standard of Review

In this appeal from a grant of summary judgment on statute of limitations grounds, our review is de novo, taking the facts in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor. Genereux v. Am. Beryllia Corp., 577 F.3d 350, 359 (1st Cir. 2009). The district court's interpretation of Code provisions is also reviewed de novo. In re Christo, 192 F.3d 36, 37 (1st Cir. 1999).

"A plan of reorganization is a binding contract between the debtor and the creditors and is subject to the general rules of contract construction and interpretation." In re New Seabury Co., 450 F.3d 24, 33 (1st Cir. 2006). The Plan provides that it is

---

$9.3 million in compensatory and punitive damages to the Trust. Id.

-12-

governed by Delaware law.  Plan § 11.15.  Under Delaware law, construction and interpretation of contract language, including the question of whether ambiguity exists, is a question of law.  See In re Olympic Mills Corp., 333 B.R. 540, 554 (B.A.P. 1st Cir. 2005) (applying Delaware substantive law).  "If the language of the contract is clear, it will be the sole source for determining [the parties'] intent"; terms are ambiguous only if they are "reasonably susceptible of different meanings."  Id.

## III.  Analysis

The dilemma facing the Trust is that it needs to find in the interaction between the Plan language and the Code something that:  (1) kept the stay in force (or otherwise extended the limitations period) until the Trust brought this suit against T&N, but that also (2) allowed this suit to be brought notwithstanding that stay.  The language of the Plan clearly accomplishes the latter by authorizing the Trust to bring suit "in any appropriate forum," Plan § 4.5.8(a), and by stating that such claims "shall be allowed to proceed in the ordinary course to judgment or settlement," Plan § 4.5.8(f)(ii).  But nowhere does the Plan even mention continuance of the stay, or any type of extension of any limitations period.

For its argument that the Plan left the stay in place even though the Plan expressly allowed suit to be brought, the Trust first hangs its hat on the fact that the Plan provided that

-13-

only upon the Hercules Policy Expiry Date would T&N be "discharged and released" from liability on the asbestos claims. Plan § 4.5.20(a)(ii). The Trust then points to two provisions of the Code: Code § 362(c)(2)(C), which provides that the stay continues until "a discharge is granted or denied," and Code § 108(c)(2), which provides that the stay extends the limitations period for any stayed claims until "30 days after notice of termination or expiration of the stay." From these provisions, the Trust argues that: (1) even though the Plan provided for the discharge of non-asbestos claims upon Plan confirmation, because it did not discharge the asbestos claims, the stay has not been lifted for those claims; and (2) if the stay has not been lifted on the claims, the thirty-day window to bring suit triggered by the termination or expiration of the stay has therefore not closed. T&N contests this reading of Code § 362(c)(2)(C), and argues that the provision means that discharge of any claim in a bankruptcy case terminates the automatic stay for all claims in that case. Under that reading, the discharge of T&N's non-asbestos claims on the Plan's effective date, Plan § 9.1.1, lifted the stay for all claims against T&N. The district court sided with T&N on this question of how the discharge operated, while a Rhode Island state court has since sided with the Trust. See <u>Gallagher</u> v. <u>American Insulated Wire Corp.</u>, No. PC 11-5269, 2014 WL 5297914 (R.I. Super.

-14-

Ct. Oct. 24, 2014); Podedworny v. Am. Insulated Wire Corp., No. PC 11-5268, 2014 WL 5490028 (R.I. Super. Ct. Oct. 24, 2014).

We need not determine who is correct about the effect of the Plan's delayed discharge provisions for the simple reason that Code § 362(c)(2)(C), the provision that continues the automatic stay until discharge, expressly recognizes an exception:  the entry of an order under Code § 362(d) "terminating, annulling, modifying, or conditioning such stay."  That language directs our attention back to the court's order approving the Plan.  Does the order, by approving the Plan, terminate the stay with respect to asbestos claims?  As we note above, it plainly does so by unambiguously allowing the Trust to bring claims against T&N and by allowing, also unconditionally, for those claims "to proceed in the ordinary course to judgment or settlement."  Plan §§ 4.5.8(a), 4.5.8(f)(ii). Indeed, if the Plan were not read as terminating the automatic stay for these claims, then they could not yet have been brought.  Thus, regardless of the effect of a delayed discharge on the automatic stay under the Code, here, the Plan itself terminated the stay, triggering the thirty-day window in Code § 108(c)(2).

The Trust's argument to the contrary is that the Plan's unconditional allowance to sue in the ordinary course is a "modification" of the stay under Code § 362(d), rather than a "termination."  Under the Trust's view, this modification extends the stay until the moment at which the Trust brings suit, at which

point the stay disappears with respect to that claim. This reading would accomplish two things: it would get around the language in Code § 108(c)(2) that provides that the thirty-day window is triggered when the stay "terminat[es]," and it would presumably explain how the Plan could achieve the counterintuitive feat of simultaneously extending the stay and allowing suit.

This "modification of the stay" argument stretches beyond the Plan's reach. Before the Plan became effective, the stay had one relevant effect on as-yet unfiled asbestos claims: it prevented suit. Once the Plan became effective, that single effect entirely disappeared. And because the Plan's discharge of liability for non-asbestos claims indisputably eliminated the effect of any stay on those claims, upon Plan confirmation there remained no stay at all that even arguably could be "modified." In other words, once the Plan became effective, nothing was being stayed.

In contrast to this straightforward reading of the Plan, the Trust would have us infer a meaning that seems anything but straightforward. In substance, the Trust would have us read a grant of a right to sue in the ordinary course as the equivalent of something that is hardly in the ordinary course: a right to sue whenever the Trust unilaterally decides to sue, no matter how long it waits, at least until the Hercules Policy Expiry Date. Even if we assume that the parties could have agreed on such a provision,

the Plan language provides no clue that they did so.  In this regard, we note that the Trust itself appears to have developed on the fly its textual argument for how the Plan provides for an extension and modification of the stay, rather than putting it forward in the district court as a reading that was accepted at the time the Plan was agreed on.  The Trust also does not point to a single case in which an unconditional allowance to file suit was deemed to be something other than a lifting of the automatic stay with respect to the claims subject to that allowance.

The Trust's failure to present language in the Plan either continuing the stay or--getting to the real issue--otherwise tolling the running of limitations periods is particularly significant given that it presumably would have been quite simple to include such language.  This complete absence of any language extending the statute of limitations for claims brought by the Trust against T&N speaks especially loudly because the Trust Distribution Procedures do expressly toll applicable limitations periods with regard to claims brought against the Trust.[9]  See Federal-Mogul Form of Asbestos Personal Injury Trust Distribution Procedures § 5.1(a)(2).

---

[9] At oral argument, the parties hinted that the drafters may have eschewed adopting such an express and direct approach to override the limitations bar to suits against T&N because the Hercules Policy barred T&N from waiving any defenses.  In any event, whatever the reason is for the omission, the Trust is left with no plausible toehold in the Plan itself.

-17-

In contrast, the Plan provision that speaks most clearly to the issue of defenses cuts against the Trust's position. Plan § 4.5.8(e) explicitly preserved T&N's right (and that of its reinsurers) to "assert any defenses, counterclaims, offsets, rights of contribution or any other rights and remedies for the purpose of reducing or defeating their liability for any [claim]," which by its plain terms includes the affirmative defense that a given claim is time-barred. See Fed. R. Civ. P. 8(c)(1). The Trust argues that the right to bring a defense does not mean the right to bring a successful defense. This is correct, but beside the point. Even if one could otherwise read into the mere authority to bring suit a de facto waiver of any statute of limitations, the explicit confirmation in Plan § 4.5.8(e) that all defenses remain on the table--without anything even suggesting a carve-out for limitations defenses--would belie such a reading.

We are especially reluctant to accept the Trust's attempt to read so much unusual and significant meaning into the Plan when the aim is to create an implicit modification of the automatic stay under Code § 362(d). That provision allows the stay to be modified "after notice and a hearing," a requirement the Trust argues was satisfied by the hearing and order confirming the Plan. While we accept the proposition that any reader of the Plan would conclude that suit could proceed on the asbestos claims, we are loathe to say that the Plan language gave notice that the automatic stay

-18-

would continue indefinitely on each asbestos claim until the Trust unilaterally terminated it for that claim. So even if the drafters intended to secure such a modification, they never gave anything that might be described as fair notice that such an unusual and significant modification was being sought.

The Trust is therefore reduced to arguing that we should find in the Plan whatever effect is required to preserve the otherwise stale claims indefinitely so as to fulfill the intent of some of the Plan negotiators as inferred from their interests and conduct. Viewed under the summary judgment standard, the record well supports the factual premise that at least some parties to the negotiation of the Plan did indeed act as if they had succeeded in largely wiping out any limitations defenses that might run before the Hercules Policy is exhausted. Specifically, no steps were taken to ensure that the Trust commenced suit (or even was prepared to commence suit) on any expiring claims promptly in the month following the Plan becoming effective.

There are two problems with this argument. First, there is no evidence that *all* parties in the T&N bankruptcy proceeding shared the interpretation of the Plan now put forward by the Trust. Indeed, T&N's very assertion of a statute of limitations defense in its answer in this case seems to say that at least one party did not share that understanding. Cf. Old Republic Ins. Co. v. Stratford Ins. Co., Nos. 14-1179, 14-1229, 2015 WL 310445, at *6-7

(1st Cir. Jan. 26, 2015) (interpreting an internal inconsistency in an insurance policy with the aid of extrinsic documentation that all parties to the policy shared the same understanding of its provisions).  Second, the Trust points to no doctrine of Delaware contract law that would allow us to interpret the Plan in a manner that is belied by its plain language.  While a court may sometimes look beyond the corners of a document to determine whether seemingly clear language contains a latent ambiguity, this doctrine typically applies only in a narrow set of circumstances in which "a word, thought to have only a single meaning, actually has two or more meanings,"  Richard A. Lord, 11 Williston on Contracts § 33:43 (4th ed.), such as when a word "denotes more than one actual thing" or "designates something particular within the industry's jargon." Coffin v. Bowater Inc., 501 F.3d 80, 97 (1st Cir. 2007).  The Trust presents no such argument about any Plan term.

Finally, the ambitious reach of the Trust's desired reading of the Plan reinforces our reluctance to glean such a reading from language that cuts so strongly otherwise.  As the Trust's counsel stated at oral argument, under the Trust's reading of the Plan, its ability to postpone indefinitely the bringing of suit as if there were no statutes of limitations would apply even to the claims of victims who got sick or died after Plan approval.[10]

---

[10] While we need not decide this issue, this conclusion does appear to follow from the Trust's position.  The Code deems asbestos claims to have accrued at the time of exposure. See In re

-20-

It has been said of statutes that one does not normally hide elephants in mouseholes.  See Whitman v. Am. Trucking Ass'ns, Inc., 531 U.S. 457, 468 (2001).  Here, we do not have in the Plan even a mousehole within which to look for such a major and unusual term of the deal.  Given the important purposes that limitations periods serve, see, e.g., CTS Corp. v. Waldburger, 134 S. Ct. 2175, 2183 (2014), this would be a highly significant concession to read into the mere authorization to bring suit against T&N.

Although nothing in this opinion bars the bringing of any claims by injured claimants against the Trust, we acknowledge that the Trust's failure to timely commence suit has the potential (if non-stale claims are not enough to exhaust the retention and the Hercules Policy) to reduce ultimately the amount of assets and insurance proceeds that the Trust has available to satisfy claims

---

Grossman's, Inc., 607 F.3d 114, 125 (3d Cir. 2010) (en banc).  Code § 362(a)(1), in turn, provides that the automatic stay applies to actions or proceedings "to recover a claim against the debtor that arose before the commencement of the case," meaning that for purposes of the Code, the stay applies to any claims arising from pre-petition asbestos exposure, whenever such claims are discovered.  Moreover, as discussed above, a primary purpose of the trust mechanism is to ensure that later-discovered claims are bound by the terms of a reorganization plan so that companies can move on despite the long latency period of mesothelioma.  See In re Combustion Eng'g, Inc., 391 F.3d 190, 234 (3d Cir. 2004).  Against that backdrop, the Plan provisions that the Trust argues extend and modify the automatic stay do not distinguish between claims that were discovered before confirmation, and those that would be discovered later.  See, e.g., Plan § 4.5.6 (providing that "any" liability for asbestos claims continues in full); Plan § 4.5.7(a) (providing that "each" holder of an asbestos claim assigns their right to the proceeds from such claim to the Trust, "whenever such rights may arise").

against it.  Whether this result could have been avoided with better drafting, we cannot say.  What we can say is that the Trust's argument fails because the Plan unambiguously terminated the automatic stay without limitation or qualification and contains no provision that even remotely provides for any further tolling of the limitations period beyond that granted by the Bankruptcy Code.

## IV.  Conclusion

For the foregoing reasons, we AFFIRM the order of the district court.